**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **AMERICAN CORN GROWERS ASSOCIATION,** | : | |
| | : | |
| **Plaintiff** | : | |
| v. | : | **C.A. No.** |
| | : | |
| **MONSANTO COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |

## COMPLAINT

Plaintiff American Corn Growers Association ("ACGA"), brings this action on behalf of itself and its nearly 10,000 members, and alleges as follows on personal knowledge as to all matters relating to itself, and on information and belief and based upon the investigation of its counsel as to all other matters:

### I.  NATURE OF THE CASE

1. Defendant Monsanto Company ("Monsanto") is the world's leading agricultural biotechnology company. It develops and manufactures various agricultural products including: (a) seeds containing genetically modified traits tolerant to glyphosate-based herbicides; and (b) glyphosate-based herbicides sold under the name "Roundup." In 2000, Monsanto had over $5 billion in total sales, 40% of which was attributable to Roundup.

2. ACGA is a voluntary membership organization, representing the interests of farmers in 35 states. Those farmers raise a variety of crops, including corn and soybeans. Since its inception in 1987, ACGA has worked to improve conditions for the American farmer and protect rural communities. In this antitrust action, ACGA alleges that Monsanto has violated federal and state

antitrust laws by using its monopoly power in various biotechnology seed trait markets to unlawfully monopolize and restrain competition in the market for glyphosate herbicides, and has otherwise acted to maintain supra-competitive pricing for its glyphosate herbicides. Monsanto's improper conduct has caused or threatens to cause injury to ACGA's members who have paid, or will in the future pay, artificially inflated and non-competitive prices for Monsanto's glyphosate products.

3.    ACGA does not oppose the development or use of either genetically-modified crops or glyphosate herbicide within a market that gives consumers choices regarding the agricultural products they purchase. Rather, the ACGA seeks to enjoin Monsanto's ongoing use of various anticompetitive tactics that have (and will) limit, deter, or impede competition from other herbicides, including lower-priced generic glyphosate. Through its anticompetitive practices, Monsanto has limited (and will continue to limit) farmers' ability to choose and gain access to competing herbicides at the lowest, fully-efficient prices that would exist absent Monsanto's conduct. By limiting farmers' choices and ability to buy competing herbicides at their lowest, fully-efficient prices, Monsanto has interfered with the normal competitive process, which in turn has reduced the pressure on Monsanto's prices. The anticompetitive effects of Monsanto's conduct have been that farmers, including members of the ACGA  (a) have been denied the benefits of free and open competition, including the development and sale of new and competing herbicides; (b) have had fewer choices among glyphosate herbicides; and (c) have been forced to pay artificially inflated and non-competitive prices for glyphosate herbicide.

4.    In September 2000, Monsanto's patent for Roundup expired, a significant event that should have opened the market to competition from competing glyphosate herbicides. Under normal, unfettered economic circumstances, the loss of a patent on a high-priced, highly-profitable

2

monopoly product would lead to increased consumer choices as lower-priced generic competitors enter the market. However, during the post patent period, Roundup at various times maintained an 80% (or more) market share of all the glyphosate herbicides sold in the United States, despite the fact that Monsanto charged dealers substantially more for brand-name Roundup than its competitors charged for glyphosate.

5.     Monsanto's ability to charge higher prices for Roundup is the result of a comprehensive anticompetitive scheme which Monsanto began implementing in the 1990s. At that time, Roundup had only limited use for growers because it is a non-selective herbicide that kills both the commercial crop (such as cotton, corn or soybeans) and unwanted vegetation such as weeds. To spur demand for Roundup (and shift sales from competing herbicides), during the 1990s Monsanto started developing genetically modified seeds that contained patented traits which made the seeds tolerant to glyphosate herbicides. This permitted Roundup to be sprayed over-the top of genetically modified crops, killing all unwanted vegetation while leaving the commercial crop unharmed. Because, according to Monsanto's aggressive advertising and promotion, Monsanto's genetically modified seeds substantially increased farmers' yields and reduced their costs, the market for those seeds grew dramatically. Monsanto quickly became the dominant manufacturer of numerous genetically modified seed traits marketed under the name "Roundup Ready." For example, within 2 years after introducing Roundup Ready cotton seeds in 1997, Monsanto's genetically modified seeds constituted 40% of all the cotton seeds planted in the United States, and by 2005 (8 years after the seeds were introduced), Monsanto's genetically modified seeds constituted 90% of all the cotton seeds sold in the United States.

3

6.    Significantly, if other non-selective herbicides are sprayed over Roundup Ready crops, the crops could be damaged or killed. Because Roundup Ready seeds can tolerate only glyphosate herbicides, and patented Roundup was the only glyphosate herbicide on the market at the time, there was a rapid and dramatic shift in herbicide sales. Within a few years after Monsanto introduced its glyphosate-tolerant seed traits, Roundup accounted for approximately 80% of all agricultural herbicide sold in the United States. Concurrently, other types of herbicides were forced out of the market and competing herbicide manufacturers (such as Dow, Dupont and others) discontinued sales of their competing products.

7.    Monsanto has been able to maintain its glyphosate herbicide monopoly through a comprehensive anticompetitve and exclusionary scheme that has involved, among other things, Monsanto's unlawful leveraging of its monopoly (or monopolies) in the market for genetically modified seed traits. As described in greater detail below, Monsanto maintained its seed trait monopolies by blocking the development of competing seeds that could tolerate non-glyphosate herbicides. Monsanto was able to block the development of competing seeds by, among other things: (a) acquiring seed companies that were developing genetically modified seed technology; (b) killing those projects that could have led to the development of genetically modified seeds that could tolerate non-glyphosate herbicide; and (c) entering into exclusive-dealing licenses with seed companies and dealers that denied actual and potential competitors access to critical developmental, marketing and distribution channels.

8.    These efforts to block the development of competing genetically modified seeds had a direct affect on Monsanto's glyphosate herbicide monopoly because had competing seeds been developed, farmers would have had a choice not only to buy competing seeds, but also to use

4

different types of herbicides instead of glyphosate. Thus, the development of these competing seeds would have created an increased demand for other non-glyphosate herbicides that would have competed with Roundup. This would have dramatically reduced Roundup's market dominance and Monsanto's ability to charge monopoly prices.

9.      Once Monsanto had unlawfully exploited and leveraged its seed trait monopolies to drive competing (or potentially competing) non-glyphosate herbicides out of the market, Monsanto was able to unlawfully maintain its glyphosate herbicide monopoly, even after its patent expired, by employing various exclusionary tying and bundling practices which: (a) penalized and punished dealers and wholesalers who sold or desired to sell more than a limited amount of generic Roundup; and (b) coerced/induced growers to buy Roundup virtually exclusively even though cheaper generic herbicides were available.

10.     The direct and proximate effect of Monsanto's anticompetitive conduct has been to unlawfully maintain its monopoly in the market for glyphosate herbicides and to command artificially inflated and supracompetitive prices for Roundup, which have been (or will be) paid by ACGA members. Absent Monsanto's anticompetitive and exclusionary conduct, once Monsanto's patent expired in September 2000, free and unfettered competition in the market for glyphosate herbicides would have offered the members of ACGA more choices in the market for glyphosate herbicides and forced Monsanto to lower substantially its prices for Roundup.

11.     In this action plaintiff seeks injunctive relief under 15 U.S.C. §26 for Monsanto's violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.§§ 1 and 2.

5

## II.  JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 (commerce and antitrust regulation) and 1337 (federal question), as this case arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), and Section16 of the Clayton Act (15 U.S.C. § 26).

13.    Venue is proper pursuant to 28 U.S.C. § 1391 (a), because Monsanto resides, transacts business, and has an agent in this district, and is therefore subject to personal jurisdiction in this district. Venue is also proper in this district under 28 U.S.C. §1391 (b) and (c), and §§ 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, 26).

14.    The goods and services at issue are marketed, shipped and sold in and through interstate commerce.  The anticompetitive acts alleged herein have substantially affected interstate commerce.

## III.  THE PARTIES

15.    Plaintiff ACGA is a not-for-profit, voluntary membership organization located in Washington, D.C.  ACGA is dedicated to improving farm policy for the benefit of farmers and rural communities, while insuring an adequate and safe food supply for consumers.  ACGA advocates on behalf of its farmer-members on issues including seed patents and genetically-modified organisms. ACGA members purchased Roundup for commercial agricultural purposes at non-competitive and artificially inflated prices, and were injured as a result.  Further, Monsanto's anticompetitive conduct is continuing, threatening to injure the members of ACGA with non-competitive and artificially inflated prices for glyphosate herbicide, as described in this Complaint.

6

16.     Defendant Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Monsanto is the world's leading agricultural biotechnology company, producing and developing agricultural products and pharmaceuticals. Monsanto had over $5 billion in total sales in 2000.  Also in 2000, $2 Billion, or approximately 40%, of Monsanto's sales were attributable to sales of Roundup. In addition to its production and sale of herbicides, Monsanto produces and/or licenses to other seed companies multiple types of biotechnology seed traits including cotton traits, corn traits and soybean traits.  Monsanto owns or controls large groups of formerly independent seed and biotechnology companies that develop and market genetically modified seed. As used herein, "Monsanto" refers to Monsanto Company and all of its subsidiaries and affiliated companies and corporations.

## IV.  **TRADE AND COMMERCE**

17.     Monsanto's acts alleged herein have taken place in and affected United States trade and commerce, and have unlawfully and unreasonably, directly, substantially and foreseeably restrained such trade and commerce.

18.     Monsanto sells and ships substantial quantities of biotechnology seed traits and "Roundup" glyphosate herbicide products in interstate commerce and receives payment for the seed or the use of proprietary genetic traits across state boundaries. As reported by Monsanto, sales of "Roundup" glyphosate herbicide products during the relevant period were approximately $2 billion per year.

## V.  **THE RELEVANT ANTITRUST MARKETS**

19.     The relevant geographic market for the product markets at issue in this case is the United States.

7

### Relevant Herbicide Markets

20.    Glyphosate herbicides used for commercial agricultural purposes constitute a relevant product market in which to analyze Plaintiff's claims.

21.    Glyphosate herbicides are non-selective, in that they do not distinguish between a commercial crop (such as cotton, corn or soybeans) and unwanted vegetation such as weeds. Glyphosate herbicides are easy to use, environmentally safe, and effective in killing a broad spectrum of weeds. Because glyphosate is the only herbicide that can be sprayed over Monsanto's Roundup-Ready genetically-modified crops, the price of glyphosate herbicides is not significantly constrained by the price of non-glyphosate herbicides. For farmers who wish to spray herbicides over their crops, only competing glyphosate herbicides can act as a constraint on the price of Monsanto's glyphosate products but, as noted below, Monsanto effectively prevented the entry of such competitors during the period following the expiration of its glyphosate patent.

22.    Monsanto has monopoly power in the market for glyphosate herbicide in the United States. Monsanto markets and sells its glyphosate herbicides under the brand name "Roundup", including "Roundup WeatherMAX," "Roundup UltraMAX" and "Roundup OriginalMAX." For years after its patent expiration, Roundup constituted more than 80% of the glyphosate herbicide marketed in the United States.

23.    Monsanto has monopoly and/or market power over the price of glyphosate herbicides and has exercised that power to charge and/or command supra-competitive prices for Roundup and to exclude potential competitors. Monsanto has erected significant barriers to entry into the glyphosate market, including restrictive seed trait licensing agreements and marketing programs penalizing the sale of competing brands of glyphosate, discussed further below. These artificial

barriers, when combined with the natural barriers to entry, such as a competitor's need to make substantial investments in a manufacturing plant, find reliable, competitively-priced sources for hard-to-find input chemicals, and overcome a number of time-consuming regulatory hurdles, have effectively precluded the entry of lower-priced competitors. This is true despite the fact that Monsanto charges a premium for its glyphosate products.

24.    Alternatively, non-selective herbicides, which include glyphosate herbicides, used for commercial agricultural purposes constitute a relevant product market. Monsanto has monopoly power in the non-selective herbicide market and possesses a market share in excess of 80%. As set forth in paragraph above, barriers to entry into the non-selective herbicide market, including those created by Monsanto, are high.

### Relevant Biotechnology Seed Trait Markets

25.    Biotechnology has made possible the introduction of new genetic characteristics, or "transgenic events" into plant seeds. The insertion of a desirable transgenic event into a seed alters the seed's characteristics conferring a desirable "trait" in the seed. Among the biotechnology seed traits most widely used are those that make a particular crop glyphosate-tolerant and those that confer pesticide-resistant traits.

### Glyphosate-Tolerant Seed Traits

26.    Glyphosate-tolerant seed traits constitute a relevant product market. Currently there are several crop-specific glyphosate-tolerant seed traits commercialized in the United States, including soybean, cotton and corn. As of 2004, genetically modified crop seeds accounted for 85 percent of all U.S. soy acreage, 45 percent of all corn acreage and 76 percent of all cotton acreage. In 2003, 84 percent of U.S. canola acreage was genetically engineered.

9

27.    Monsanto has monopoly and/or market power in the market for glyphosate-tolerant seed traits which it markets under the name "Roundup Ready." These include "Roundup Ready Corn," "Roundup Ready Cotton," "Roundup Ready Soybeans," "Roundup Ready Canola" and "Roundup Ready Alfalfa." Upon information and belief, during the relevant period:

(a) glyphosate-tolerant soybean seeds containing Monsanto seed traits constituted over 95% of the glyphosate-tolerant soybean seeds sold in the United States;

(b) glyphosate-tolerant cotton seeds containing Monsanto seed traits constituted over 90% of the glyphosate-tolerant cotton seeds sold in the United States; and

c) glyphosate-tolerant corn seeds containing Monsanto seed traits constituted over 95% of the glyphosate-tolerant corn seeds sold in the United States.

28.    As alleged herein, there are substantial barriers to entry with respect to glyphosate-tolerant seed traits which include the considerable time and expense to develop seed traits and obtain the necessary regulatory approvals. Furthermore, as alleged herein, Monsanto's exclusionary conduct has imposed additional barriers to entry by foreclosing actual and/or potential competitors in the market for glyphosate-tolerant seed traits from access to various critical manufacturing and distribution assets and channels.

29.    Alternatively glyphosate-tolerant corn traits, glyphosate-tolerant cotton traits, glyphosate-tolerant soybean traits, glyphosate-tolerant canola traits and glyphosate-tolerant alfalfa traits constitute relevant product markets or sub-markets of the broader market for glyphosate-tolerant seed traits defined above.

10

### Pest-Resistant Seed Traits

30. Pest-resistant seed traits constitute a relevant product market. Pest-resistant seed traits provide protection against various insects and pests such as European Corn Borer, Rootworm and other lepidopteran insect pests. Monsanto has monopoly power in the market for pest-resistant seed traits which it markets under the names "YieldGard Corn Borer", "YieldGard Rootworm", "YieldGard Plus" (a combination of YieldGard Corn Borer and YieldGard Rootworm), "Bollgard Cotton" and "Bollgard II Cotton." Upon information and belief, Monsanto's share of the pest-resistant seed trait market is in excess of 80%.

31. Alternatively, each of the pest-resistant seed traits identified above constitutes a separate product market or submarket of the broader pest-resistant seed trait market.

32. As set forth above, there exist substantial natural barriers to entry into the market for pest-resistant seed traits or alternatively the submarkets for pest-resistant seed traits which include the considerable time and expense required to develop the seed traits and obtain the necessary regulatory approvals. Monsanto has erected additional barriers to entry through its imposition of restrictive seed-trait patent licenses on seed companies.

33. Monsanto has also placed various restrictions on the ability of seed companies who develop seeds for farmers to combine or "stack" various Monsanto GM seed traits, such as glyphosate-tolerant seed traits with pest-resistant seed traits. As alleged below, the way that Monsanto tied and bundled its seed traits at the seed company level has created additional barriers to entry for companies wishing to sell either competing herbicide-resistant seed traits or competing herbicides. This is so because seed companies have been deterred from: (a) buying competing herbicide-resistant seed traits from Monsanto's rivals (or helping Monsanto's rivals develop

11

competing herbicide-resistant seed traits); and/or (b) promoting a glyphosate herbicide other than Roundup.

## VI.   FACTUAL ALLEGATIONS

### A.   Weeds and Herbicides

34.     Weeds reduce crop yield and quality.  To control weeds, growers use significant amounts of herbicides, or chemical compounds that destroy or inhibit the growth of undesirable plants.  Herbicides are usually used as part of a field maintenance program, either prior to, or in conjunction with, the planting and growing of the crop.  As a general matter, these herbicides can be classified by type of activity:  (a) *selective herbicides* that are tolerated by the crop but will kill or suppress one or more weeds that infest the crop, and (b) *non-selective herbicides* that are active on all vegetation that is present at the time of application, including the crop.  Non-selective herbicides do not distinguish between a commercial crop (such as cotton, corn or soybeans) and other unwanted vegetation such as weeds.

35.     Because there is no single selective herbicide that can control all types of weeds with equal effectiveness, growers must apply a combination of selective herbicides, either at the same time or in sequence, to control important target weeds.  Selective herbicides are usually classified by (a) the kind of weeds they control (*e.g.*, grass or broadleaf), (b) the timing of the application (pre-emergence or post-emergence of the crop), and (c) the length of time the herbicide controls weeds (residual control).

36.     Since 1974 Monsanto has manufactured and sold a non-selective herbicide called "Roundup," of which glyphosate is the active ingredient.  Because it is a non-selective herbicide,

12

Roundup kills a wide variety of vegetation, without distinguishing between valuable crops and unwanted weeds.

**B.    Biotechnology Crop Seed Traits**

37.    In or about 1992, Monsanto began investigating the creation of genetically-modified crops. In 1997, Monsanto commercially introduced genetically modified cotton seeds that were glyphosate-tolerant and which would therefore allow Roundup to be applied post-emergence, or "over the top" of the cotton crop, without destroying the plants. These glyphosate-tolerant cotton varieties are marketed under the Monsanto trademark "Roundup Ready." In 1998, Monsanto introduced genetically modified Roundup Ready corn seeds. Since then Monsanto has commercialized soybean, alfalfa and canola seeds containing traits conferring Roundup tolerance.

38.    In addition to glyphosate-tolerant seed traits, Monsanto also developed pest-resistant biotechnology traits such as corn seed resistant to the European Corn Borer ("ECB") and rootworm which were created by the insertion of the gene for Bacillus thuringensis ("Bt") into the corn seed genome. Monsanto sells its pest-resistant corn seed traits under the name "YieldGard." Monsanto has also developed pest-resistant cotton seed traits which it sells under the name "Bollgard." Monsanto has monopoly power in pest-resistant seed traits, since the vast majority (if not all) pest-resistant seeds use a patented, Monsanto pest-resistant trait.

39.    As alleged in more detail below, Monsanto has conditioned (a) the amount of patent licensing fees that seed companies have to pay Monsanto regarding pest-resistant traits, and (b) the rebates that dealers and distributors receive from Monsanto for the sale of pest-resistant seeds, on seed company and dealer conduct with regard to other products, such as herbicide-resistant seed traits and Roundup. Thus, if a seed company promotes either competing herbicide-resistant seeds

13

or a competing herbicide, or a dealer or distributor sells too much of a competing herbicide, Monsanto imposes financial penalties in connection with pest-resistant seeds. In other words, if seed companies, distributors or dealers do not sufficiently support the maintenance of Monsanto's market share in the markets for herbicide or herbicide-resistant seed traits, then Monsanto will penalize those entities in a different product market where Monsanto has monopoly power. By financially bundling pest-resistant seed traits with herbicide-resistant seed traits and Roundup, Monsanto has used its monopoly power in pest-resistant traits to exclude competition in the relevant herbicide market, and obtain and maintain monopoly power in that market.

40.    Since the introduction of Roundup Ready cotton seeds in 1997, the number of acres planted with Monsanto's Roundup Ready seed traits has grown dramatically. By 1999, Roundup Ready cotton seeds accounted for nearly six million of the 14.6 million acres of cotton grown in the United States in that year. On information and belief, as of 2000, Roundup Ready cotton seeds comprised approximately 50% of all the cotton seeds grown in the United States. As of 2005, Roundup Ready Soybeans seeds constituted 80% of all soybean seeds grown in the United States, and Roundup Ready Corn seeds constituted 45% of the corn seeds bought in the United States.

41.    Monsanto licenses its genetically-modified seed traits to independent seed companies who mass produce seeds that contain a combination of conventional plant traits with various genetically-modified seed traits. Over the last several years, a few hundred seed companies have been the source for virtually all of the farmers' corn, cotton and soybean seeds. A limited number of the seeds containing Monsanto's patented traits are produced by various Monsanto-owned subsidiaries discussed below. However, during the last several years the bulk of genetically-modified seeds have been produced and sold to farmers by independent seed companies, who pay

14

Monsanto a patent royalty or fee for the right to incorporate Monsanto's patented genetic traits into the seeds that these seed companies produce and sell.

**C.  Monsanto's Domination of the Market for Biotechnology Seed Traits**

     **i.  Monsanto Suppressed and Blocked the Development of Competing Seed Traits Through the Acquisition of Actual and Potential Competitors**

    42.  Starting in or around 1996, in order to realize its strategy of obtaining a seed trait monopoly, Monsanto embarked on an $8 billion acquisition program whereby it acquired, merged with, or obtained an ownership interest in a large number of then existing and leading biotechnology and seed companies. Monsanto's plan also included the suppression of potentially competing herbicide-tolerant trait technologies – such as glufosinate-tolerant traits – that could compete with Monsanto's Roundup Ready technology. Monsanto's strategy – which it successfully implemented – was to impede or limit the number of competing herbicide-resistant seeds that were available in the market in order to: (a) limit farmers' choices regarding which herbicide-resistant seeds to plant; and (b) limit farmers' choices of which herbicides to use.

    43.  Monsanto's end goal was to limit competition from other non-glyphosate herbicides, and thereby charge inflated, supra-competitive prices for glyphosate. Had competing seeds been developed that were resistant to glufosinate or other non-selective herbicides, farmers would have been able to choose between competing types of herbicide-resistant seeds and also would have had the choice to use competing herbicide(s) on their genetically-modified crops. This competition would have forced Monsanto to lower its Roundup prices. By preventing the development and manufacture of competing herbicide-resistant seeds, Monsanto prevented the widespread use of competing herbicides, and thereby suppressed or blocked competition in the herbicide market.

44.    In 1996, Monsanto acquired a minority interest in DeKalb Genetics Corporation ("DeKalb"), which was seeking to develop a hybrid corn seed. Monsanto also acquired a license to the GA21 event which DeKalb was jointly developing with Rhone-Poulenc (later Bayer), as well as the intellectual property rights for an ECB-resistant corn trait seed and a seed trait that provided resistance to glufosinate, an alternative non-selective herbicide that competed with glyphosate. In 1998 Monsanto acquired the remaining shares in DeKalb and withdrew all support for the development of glufosinate-tolerant corn traits. Thus, as a result of its acquisitions, Monsanto effectively suppressed the development and commercialization of a seed trait imbuing tolerance to a non-glyphosate herbicide, and in so doing eliminated a potential competitor to its own Roundup Ready or glyphosate-tolerant traits.

45.    During this period, AgrEvo (an Aventis predecessor) was also trying to develop a glufosinate-based seed trait through a collaboration agreement with Asgrow, a soybean and corn seed company. Had AgrEvo been able to develop such seeds, growers could have sprayed glufosinate over glufosinate-tolerant crops, and thus had a choice in both herbicide-tolerant seeds and herbicides. In or about February 1997, however, Monsanto acquired Asgrow and promptly killed the glufosinate project.

46.    In September 1997, Monsanto acquired Holdens Foundation Seed ("Holdens"), another large seed and technology company, and in 1998 similarly caused Holdens to withdraw its support for glufosinate-tolerant corn traits.

47.    During this period Monsanto also acquired various other seed and seed technology companies such as Argrocetes (1996), Ecogen (1996), Calgene (1997) and Plant Breeding

16

International (1999) (a Brazilian seed company), all of which had been involved in the development and/or production of biotechnology traits or seeds.

48.     Through its acquisitions from 1996 to 1998, Monsanto gained control over approximately 45% of the foundation corn seed production in the United States and 70% of the foundation corn seed sold or licensed to independent seed companies. Because foundation seed companies like Dekalb, Holdens and Asgrow play a critical role in the testing, development and commercialization of new types of seeds, Monsanto's acquisition of those companies substantially reduced the number of actual and/or potential competitors that could otherwise compete with Monsanto in the emerging market for genetically-modified glyphosate-tolerant seed traits.

49.     Moreover, by eliminating ongoing projects to develop seeds that were tolerant of other types of herbicide, Monsanto ensured that its domination of the market for genetically modified herbicide-tolerant crop seed and Roundup would be long term.  More specifically, a very long lead time is needed to develop and commercialize a genetically modified herbicide-resistant crop seed. As an initial matter, it can take several years to identify the genetic traits that will make a plant herbicide-tolerant. Once those genetic traits are identified, it may take a substantial amount of time to isolate and extract those genetic traits so that they can be incorporated into a corn, soybean or cotton seed. Once that is done, it takes several growing cycles to identify and isolate exactly which forms of the seeds will grow best in various conditions and in varying climates.  Finally, once the appropriate seeds are created, it will take several growing cycles to amass enough seeds to start selling commercially to farmers.  Consequently, by eliminating existing projects to develop seeds that tolerated other herbicides, Monsanto delayed the market entry of such seeds for several years.

17

50.     These acquisitions by Monsanto not only eliminated competition in the developing

market for genetically-modified crop seeds, and prevented the development of genetically-modified

crop seeds that would be tolerant of competing herbicides, but also limited farmers' options and

choices of herbicides, and thereby stifled competition in the related herbicide market. It was clearly

understood by observers at the time that by eliminating or co-opting actual or potential rivals that

might create seeds that could be used with other competing herbicides Monsanto's acquisitions were

intended to protect Monsanto's herbicide business. A March 1997 article in the agricultural

publication, Seedling, stated that:

> Monsanto's longtime patent monopoly on Roundup will expire in 2000, so the company
> could lose its clamp on those sales very fast. Enter biotechnology. By having a gene from a
> microorganism inserted, crop plants can now be showered directly with the chemical. The
> idea, for Monsanto, is to extend the market life of Roundup beyond the patent. By creating
> crops tailored to withstand Roundup, Monsanto will keep its herbicide sales secure.

                                        *   *   *

> The Holden purchase is like buying one of the best gene banks in the world, if gene banks
> were normally for sale. On December 2, 1996, the investment banking firm Dain Bosworth
> predicted in a report the sale of Holden and estimated the price at $300-500 million:
> "Holden's high price has very little to do with Holden as a seed company and a lot to do with
> the battle between chemical giants for future sales of herbicides and insecticides."

(emphasis added). Thus, it was recognized in 1997 that Monsanto's seed company acquisitions were

connected, at least in part, to the herbicide and insecticide battles that would be won or lost based

on the types of seed traits that were available in the market.

### ii.     Monsanto Used Exclusive Dealing Contracts With Independent Seed Companies To Block Key Channels That Were Critical To The Full Development of Competing Seed Traits

51.     In addition to eliminating actual competition through acquisitions, Monsanto also

pursued a strategy of neutralizing potential competitors by entering into restrictive licensing

18

agreements with independent seed companies. As a result of the success of Monsanto's aggressive

marketing of its genetically-modified crops, seed companies that grow and sell seeds for use by

farmers were interested in obtaining a patent license so that they could include Monsanto's patented

gene technology in the seeds that they sold.

52.    Starting in or about 1997, Monsanto entered into numerous long-term (typically ten

year) licensing agreements with hundreds of seed companies who grow the seed containing

Monsanto's biotechnology seed traits for resale to the market. These agreements: (a) bundled

together the patent license fees for various types of Monsanto seed traits; and (b) provided that any

seed company who sold more than an *de minimus* amount of seeds containing a competing herbicide

trait would be penalized by having to pay substantially higher patent license fees for all Monsanto

seed trait products sold. For example, Monsanto's licenses with seed companies typically provide

that Monsanto will pay substantial incentive rebates and waive royalty fees provided the seed

company's sales of Monsanto's products, per seed trait and in combination, constitute 70-85% of

a seed company's total sales.

53.    Monsanto's patent licenses allow seed companies to produce various seeds that may

contain: (i) Monsanto's herbicide-resistant corn traits, (ii) Monsanto's corn-borer resistant-corn

traits, (iii) Monsanto's root worm-resistant corn traits, (iv) Monsanto's Roundup Ready herbicide-

resistant cotton traits; (v) Monsanto's pest-resistant cotton traits; (vi) Monsanto's herbicide-resistant

soybean traits; and/or (vii) various combinations of these traits . If a seed company's sales fall below

the specified percentage threshold for even one type of seed variety, however, Monsanto can penalize

the seed company for all of the other seed traits produced and/or sold by the seed company by,

among other things, withholding rebates and other financial incentives. Thus, for example, if a seed

company producer sells too many soybean seeds containing a rival's competing herbicide-resistant soybean trait (were one available), then Monsanto can penalize the seed company by making it pay higher patent royalties for seed traits in corn or cotton. In such a situation, Monsanto uses its monopoly power in one seed-trait market to penalize the seed company for favoring Monsanto's rival in another seed-trait market.

54.    Monsanto's use of licenses to block the development and growth of competing types of biotechnology seed traits and herbicides was the focus of its 1996 strategy called the "Monsanto Maize Protection Business Plan". The Monsanto Maize Protection Business Plan outlined a scheme to obtain and exercise monopoly control in the markets for biotechnology seed traits by licensing seed trait technology (including the glyphosate-tolerant technologies) to independent seed companies who might otherwise compete with Monsanto. The Monsanto Maize Protection Business Plan set forth, among other things, the following plan of action:

> Monsanto should enter into commercial agreements with the Maize seed companies that comprise 90% of the sales in the U.S. hybrid market;
>
> If we [Monsanto] can secure 90% of the distribution, it will be difficult for our competitors to gain significant share long term;
>
> It will be more difficult for other suppliers of traits to demand dollars and expect gene switching when seed companies are already paying Monsanto;
>
> Patents for Roundup Ready genes have been issued. Using these patents and agreements with Maize seed companies, Monsanto can prevent the use of any other glyphosate product in-crop [a.k.a. Roundup Ready competitor] to corn.

While the Monsanto Maize Protection Plan addressed genetically modified corn seeds, upon information and belief, the foregoing strategy became the blueprint for Monsanto's overall licensing strategy to restrict competition in the biotechnology seed traits and related markets.

55.     By using bundled rebates and punitive patent licensing fees at the seed company level, Monsanto has leveraged its market power across multiple product markets to penalize seed companies that threatened to develop competing herbicide-resistant seeds. As alleged above, had competing seeds been developed that were resistant to glufosinate or other alternative herbicides, farmers would have been able to choose from two or more competing types of herbicide-resistant seeds and would have had the choice to spray alternative, competing herbicide(s) on their genetically-modified crops. This would have placed competitive pressure on Monsanto to lower the price of Roundup. By preventing the development of competing herbicide-resistant seeds, and the wide-spread use of competing herbicides, Monsanto prevented or blocked competition in the herbicide market.

56.     Furthermore, Monsanto's seed-trait patent licenses with seed company's prohibited seed companies from growing or developing new seeds that combined or "stacked" Monsanto's genetic traits with traits that would make the seeds tolerant of other types of herbicides. Thus, for example, a seed company that wished to grow and sell Monsanto's pest-resistant corn could not combine that trait with another company's herbicide-resistant trait. These seed companies were thus locked into non-terminable long-term licenses that prohibited them from developing seeds or traits that were tolerant of both glyphosate herbicides and other non-selective herbicides and/or promoting a glyphosate herbicide other than Roundup.

57.     Finally, the agreements also required the seed companies to use and promote only Roundup herbicides in connection with the Roundup Ready seed they produced. For example:

(a)     In or around 1997, Monsanto sub-licensed to Syngenta the technology for ECB-tolerant corn which Monsanto had licensed from Dekalb in1996, so that Syngenta could develop and market ECB-tolerant seeds. Syngenta was prohibited, however,

from promoting the fact that the ECB-tolerant seed was tolerant of glufosinate-based herbicides, thereby suppressing information which would stimulate the demand for glufosinate-based herbicides; and

(b)    In or about April 1992, Monsanto sub-licensed to Pioneer Monsanto's technology for Roundup-tolerant soybean seeds. Under the license agreement, Pioneer agreed to insert Roundup-tolerant gene traits into Pioneer's most promising soybean varietal lines, and that Pioneer would promote only Roundup herbicide for use with its herbicide-tolerant soybeans.

58.    Ironically, while Monsanto was aggressively seeking to sign seed companies to long term licenses with respect to glyphosate-tolerant biotechnology, it turned out that Monsanto did not have any rights to the particular technology its was licensing. As previously alleged, in 1996, Monsanto acquired a minority interest in Dekalb, then a leading biotechnology seed trait company. Dekalb then licensed to Monsanto the intellectual property rights to the GA21 (glyphosate-tolerant) trait that DeKalb was developing in collaboration with Rhone-Poulenc. In 1997, however, Rhone-Poulenc (now Bayer CropScience) sued DeKalb and Monsanto alleging that DeKalb had misappropriated Rhone-Poulenc's GA21 technology. In February 2000, DeKalb was held to have no rights in GA21, *Rhone-Poulenc Agro, S.A. v. Monsanto Co. And Dekalb Genetics Corp.*, No. 1:97CV1138, 2000 U.S. Dist. LEXIS 21330 (M.D.N.C. Feb. 8, 200), *aff'd in relevant part*, 272 F.3d 1335 (Fed. Cir. 2001).

59.    Recognizing that the glyphosate-tolerant biotechnology rights it had licensed to numerous seed companies was now non-existent, Monsanto required its "licensees" to switch to NK603 (a glyphosate-tolerant event Monsanto owned) and sign new, equally restrictive NK603 contracts.

60.    In or about February 2004, Syngenta Seeds, Inc., a direct competitor of Monsanto, acquired the rights to the GA21 glyphosate-tolerant corn trait from Bayer CropScience, and

22

announced its plan to market a glyphosate-tolerant seed trait in competition with Monsanto. Syngenta is also the manufacturer of glyphosate herbicide sold under the name Touchdown.

61.    According to an antitrust complaint filed by Syngenta in this Court, *Syngenta Seeds, Inc., v. Monsanto Company and Monsanto Technology, LLC,* C.A. No. 04-908-SLR, once Monsanto learned of Syngenta's efforts to develop and market its own glyphosate-tolerant corn seed traits based on the GA21 event, Monsanto prohibited its seed company licensees from developing a seed using the GA 21 event, effectively foreclosing competition from Syngenta in glyphosate-tolerant corn traits.

62.    Monsanto's efforts to block Syngenta's GA21-trait corn seeds from the market were significant because Syngenta's entry into the market with a GA21-trait would have created real competition not just for Monsanto's Roundup Ready corn-seeds, but glyphosate herbicides as well. Syngenta now manufactures and sells its own glyphosate herbicide under the name "Touchdown." Had Monsanto not blocked and/or delayed Syngenta's access to the market, a competing biotechnology corn seed trait and a competing glyphosate herbicide would have been available to growers.

**D.    Monsanto Exploits its Monopoly in the Gylphosate Tolerant Seed Traits Market to Unlawfully Acquire/Maintain its Monopoly Power in the Glyphosate Herbicide Market**

63.    As a result of Monsanto's development and the wide acceptance of glyphosate-tolerant seed traits, Monsanto's sales of Roundup increased exponentially.  Because the use of Roundup Ready seeds with Roundup herbicide eliminated the need for most other herbicides, there was a dramatic shift to Roundup and an equally significant shift away from other herbicides. Roundup's market share of all herbicides used for cotton increased from 8% prior to 1997 to

approximately 50% in 1999. Other previously-dominant herbicide companies found that their sales dramatically declined, and those competitors decided that they would discontinue their competing herbicides and shift to also selling glyphosate once Monsanto's patent expired in September 2000.

64.    Monsanto feared a substantial loss of revenue resulting from the expiration of its glyphosate patent (Roundup had accounted for almost 50% of the company's revenue) and the expected competition from other manufacturers such as Dupont or Dow who might sell generic versions of Roundup. Indeed, in an October 2000 stock prospectus filed with the SEC, Monsanto identified generic competition in the glyphosate herbicide market as a "principal risk" to Monsanto, and its 2001 Annual Report stated that Monsanto's "most important near-term priority is [to] . . . limit potential price erosion" of Roundup. To protect its glyphosate monopoly from generic competition, Monsanto undertook various steps at the manufacturer and seed company level to prevent the emergence of competing generic forms of glyphosate. For example, Monsanto entered into supply agreements in the late 1990s with DuPont, Dow, Novartis, Nufarma, Cyanamid, BASF and other chemical companies under which: (a) Monsanto would supply the glyphosate salt used in Roundup (which was still patented at the time); and (b) the companies would have a license to produce and sell herbicides containing Monsanto's patented glyphosate-salts under their own brand names. In a number of instances, Monsanto actually supplied, and still supplies, competitors (such as Dupont or Dow) with not only the basic, chemical ingredients, but the entire finished product wrapped in the competitors' packaging. These supply agreements limited a competitor's incentive to invest in building glyphosate factories, thereby: (a) ensuring that competitors did not have the infrastructure and equipment to effectively compete with Monsanto; (b) perpetuating Monsanto's

24

control over the key glyphosate inputs; and (c) maintaining, if not increasing, Monsanto's control over the herbicide market.

65.    Furthermore, to prevent price erosion and maintain its monopoly profits from Roundup, Monsanto pursued a systematic licensing and marketing strategy that leveraged its monopoly power in the seed trait markets (including but not limited to glyphosate-tolerant seed trait market) to (a) coerce and/or pressure dealers and distributors to substantially restrict the amount of generic glyphosate herbicides they carried and sold to growers and (b) require growers who wished to plant seeds that contained Monsanto's biotechnology traits to use Roundup herbicide virtually exclusively rather than a competitor's generic equivalent herbicide product.

66.    Monsanto's dealers and distributors are subject to a variety of restrictive conditions that limit their ability and incentive to sell competing glyphosate herbicide products, and which in fact penalize them for selling non-Monsanto herbicides. These restrictive conditions include, for example, minimum percentage sales requirements that typically require a dealer's Roundup sales to constitute 80% or more of the dealer's total glyphosate herbicide sales. Under Monsanto's arrangements with dealers and distributors, if a dealer's or distributor's total sales of Roundup herbicides falls below the stipulated percentage, the dealer or distributor forfeits all, or a substantial portion, of the rebates otherwise payable on all of its Roundup sales. In some instances, Monsanto is deliberately vague as to the percentage of glyphosate sales that must be Roundup, so the only way a dealer or distributor can be sure that it will not lose any rebates is to make Roundup its exclusive glyphosate herbicide. The rebates a dealer receives from Monsanto are a significant part of the dealer's income, since dealer and distributor markups are generally small, and dealers therefore must strictly adhere to Monsanto's percentage sales requirements.

67.     Upon information and belief, Monsanto has various programs, such as its so-called "Action Pact Program," pursuant to which Monsanto pays dealers and distributors a percentage rebate on (a) their purchases of Roundup herbicide, (b) their purchases of genetically modified seeds containing Monsanto's seed traits from either Monsanto or a separate seed company that licensed the technology from Monsanto, and (c) the substantial "technology fees" which the growers must pay in connection with their use of Monsanto's patented seed trait technology – *provided the dealer's sales to growers meet or exceed Monsanto's market share for Roundup*. Moreover, the rebates available in connection with herbicide purchases, seed purchases, and patent fees are bundled together by Monsanto, and the existence or amount of the rebate that Monsanto ultimately pays to the dealer for sales of any Monsanto genetically modified seed or herbicide product is based on the extent of the dealer's compliance with Monsanto's percentage sales requirements for Roundup. In other words, if more than 10 - 20 % of the dealer's glyphosate herbicide sales are generic, a dealer will be penalized and forfeit all its rebates on Monsanto seed sales and technology fees, not just on its Roundup sales.

68.     Monsanto's rebate programs are patently exclusionary and lack any procompetitive purpose since they are not volume or cost based. Additionally, there is no procompetitive or non-exclusionary justification for bundling the rebates on Monsanto's seed trait products with the percentage of a dealer's sales of Roundup. In economic terms, Monsanto's rebate program imposes a substantial cost (or penalty) on any dealer or distributor that purchases anything more than a token amount of generic glyphosate herbicides. As a result of Monsanto's rebate programs, dealers and distributors have little or no incentive to purchase, stock or sell generic glyphosate, because if they

sell more than a *de minimus* amount, they stand to be penalized by losing the substantial rebates the would otherwise receive on the sale of Monsanto products.

69.    Because of Monsanto's practices, agricultural dealers and distributors have been coerced into limiting the amount of competing glyphosate that they are willing to sell. This has reduced, and will continue to reduce or limit, the herbicide options and choices available to farmers, including the ACGA's members. Moreover, by using its various practices to dramatically stifle the amount of generic glyphosate that competitors could sell, Monsanto has been able to impede or deter rivals from achieving : (a) fully-efficient operations, (b) the lower costs that result from fully-efficient operations; and (c) the lower prices that result from lower operating costs and unfettered competition. Thus, even where competing glyphosate is available, (a) the prices are higher than they would have been absent Monsanto's conduct, and (b) the prices will continue to be higher so long as Monsanto's anticompetitive practices remain in place.

70.    Finally, Monsanto has also imposed exclusionary and restrictive conditions at the grower level that prevent growers from using generic glyphosate in connection with Monsanto's glyphosate-tolerant seed traits. While Monsanto does not typically sell seeds directly to farmers, Monsanto requires growers to sign a technology license, the Grower's Agreement and Technology Use Agreement ("TUA"), that effectively mandates that they use only Roundup herbicides on Roundup Ready crops. When Monsanto (and its licensed seed companies) first commercialized various Roundup Ready seeds in 1997, Monsanto explicitly conditioned the grant of a license to use its Roundup Ready seed technology on the grower's agreement to purchase and use only Roundup herbicide. For example, from 1998 thru 2000 , the Grower's Agreement provided that

27

if a herbicide containing the same active ingredient as a Roundup Ultra herbicide (or one with a similar mode of action) is used over the top of Roundup Ready crops, you (the farmer) agree to use only Roundup branded herbicide.

71.     While the language in Monsanto's more recent Grower's Agreements and TUAs appear to permit a grower to use a non-Roundup glyphosate herbicide in connection with Monsanto's glyphosate-tolerant seed traits, other aspects of the Grower's Agreement demonstrate that this "choice" is illusory and that a grower is still effectively locked into using Roundup virtually exclusively.

72.     When Monsanto first began marketing biotechnology seed traits in 1997, it recognized that farmers would be reluctant to pay the higher prices for those seeds because crop failures were a significant risk, and growers would frequently lose their crops to adverse natural occurrences (such as hail, frost, drought, etc.). Accordingly, to induce growers to buy the significantly more expensive biotechnology seeds, Monsanto included as a component of the Tech Fee and patent/technology license the grower pays, a crop protection program pursuant to which Monsanto agreed to waive the Tech Fee for replacement seeds if the crop failed within the first 60 days after planting. Because, as alleged earlier, the Tech Fee constitutes a substantial component of the grower's seed costs (up to 70%), the crop protection program was and still is a critical factor in a grower's decision to use seed with biotechnology seed traits. Significantly, Monsanto's crop protection program is not otherwise available and cannot be purchased independently by any grower, in large part because Monsanto has exclusive control over its patented seed trait technology, and thus Monsanto has the sole ability to reward or punish growers for their herbicide choices by altering how much, if any, the growers have to pay for Monsanto's seed licenses.

73.     Monsanto has continually acknowledged the importance of the crop protection program to its ability to sell its biotechnology products. For example, Monsanto's website currently describes the crop protection program as "the comprehensive program you [the grower] rely on for

28

trait and herbicide investment protection," and the crop protection program "offers added protection
and reduced risk program elements for your farming operation so you can farm with confidence
when you use Monsanto technologies and agricultural herbicides. Since 1997, over 236,000 growers
have claimed more than $451 million in program benefits."

74.    Up until at least 2000/2001, a grower was automatically entitled to the crop protection
program once it paid the Tech Fee. Thus, up until 2000/2001, growers automatically received – at
no additional cost – the valuable replacement Tech Fee waiver as part of the growers' original
purchase. However, at or about the same time that Monsanto revised its Grower and TUA
agreements to give the appearance that a grower could use generic Roundup on Monsanto seed traits,
Monsanto modified its crop protection program requirements to make the benefits available *but only
if the grower used Roundup*. Growers who continue to use Roundup still receive the replacement
Tech Fee waiver at no additional cost as before, but growers that want to use generic glyphosate
herbicides are faced with a substantial penalty – the replacement Tech Fee costs. Moreover, to
continue to get the benefits of the "Roundup Rewards" program (Monsanto's current name for its
crop protection program), the grower must use Roundup not only for over-the-top application, but
for general field clearing ("burndown") purposes as well. Monsanto has effectively maintained the
same condition in its technology license that requires a grower using Monsanto's biotechnology seed
traits to use Roundup virtually exclusively rather than a cheaper generic glyphosate herbicide.

75.    The "Roundup Rewards" crop protection program has contributed to Monsanto's
exclusionary scheme to eliminate competition in two significant ways. First, the program imposes
pricing penalties that punish growers who buy competing glyphosate herbicides, limiting demand
for competing products.    Second, the Roundup Rewards crop protection program supports
Monsanto's broader exclusionary scheme through a "push" and "pull" strategy. As alleged above,
Monsanto has used various types of bundled rebates and other penalties to limit the supply of generic

29

glyphosate herbicides on dealer shelves. This limits competitors' ability to gain access to the markets through dealers that might otherwise "push" the product. Monsanto's Roundup Rewards crop protection program also works to penalize farmers who buy competing glyphosate herbicides, thereby limiting the customer "pull" for competing products. If dealers believed that they could shift all (or virtually all) of their herbicide sales to competing glyphosate herbicides, then dealers that did so would suffer only a limited penalty from the loss of Monsanto's Roundup rebates because the dealers would shift virtually all of their sales away from Roundup, and thus the Roundup penalties would apply to only a small volume of Roundup purchase (although the dealers would still continue be harmed and coerced by the penalties that Monsanto would impose in connection with seed and tech-fee rebates). Because Monsanto's Roundup Reward program has been able to limit the demand for generic glyphosate herbicides, it means that even if a dealer wanted to sell generic herbicides, a substantial amount of its sales would still be brand-name Roundup, and thus the dealer would be seriously penalized, and at serious financial risk, from the loss of the herbicide rebates (as well as the seed and Tech fee rebates).

76.    The combination of both limiting demand for generic glyphosate herbicides through the crop protection program, and limiting supply on distributor and dealer shelves, has enabled Monsanto to contain and curtail the extent of its competitive risk and market exposure from competing glyphosate products. This, in turn meant that Monsanto was unconstrained by competition and could charge a substantial premium for its brand-name Roundup, because Monsanto knew that it faced only limited competitive exposure due to its efforts to limit grower demand and dealer willingness to sell the competing products. Monsanto would have been forced by competitive pressures to charge substantially lower prices for Roundup absent its exclusionary conduct, and the

30

total, aggregate effect of Monsanto's scheme has enabled it to charge inflated, supra-competitive prices for Roundup.

77.    In sum, as a result of Monsanto's anticompetitive conduct, Monsanto has unlawfully restrained trade and maintained its monopoly in the market for glyphosate herbicides. The effect of these unlawful agreements and monopolistic conduct has been to foreclose competition in the glyphosate herbicide market and to impede or interfere with the choices and ability of farmers (including ACGA members) to buy competing herbicides (including generic glyphosate) that would have been available at lower prices absent Monsanto's anticompetitive conduct.

## VII.  INJUNCTIVE RELIEF

78.    Monsanto's violation of federal and state antitrust law are continuing and the effects thereof will continue unless injunctive relief is granted. Plaintiff has no adequate remedy at law.

## COUNT I

### Claim for Injunctive Relief Under 15 U.S.C. §26
### Unreasonable Restraint of Trade in Violation of §1 of the Sherman Act
### Anticompetitive Agreements

79.    Plaintiff realleges the factual allegations of the preceding paragraphs of this Complaint and incorporates them into this Count as if set out in full herein.

80.    Monsanto has monopoly power in the relevant markets for biotechnology seed traits, including the market for glyphosate-tolerant seed traits.

81.    Beginning in or around 1999, and continuing to date, Monsanto has engaged in unlawful contracts, combinations, conspiracies and agreements in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  As a result of Monsanto's anticompetitive agreements and conduct, competition in the market for glyphosate herbicides has

been substantially reduced, limited and foreclosed. Monsanto's exclusionary agreements include, for example, (a) exclusionary contracts and agreements with seed companies that have prevented the development of competing herbicide-resistant seeds and the promotion of competing herbicides, and (b) exclusionary agreements with distributors and dealers which have blocked, impeded and/or prevented the ability of rivals selling competing glyphosate to enter the herbicide market or expand their share of that market.

82.    Members of the ACGA have been, and will continue to be, injured in their business and property as a result of Monsanto's aforesaid violations of §1 of the Sherman Act. As a result of Monsanto's conduct, Monsanto has caused ACGA members to pay artificially-inflated and supra-competitive prices for Monsanto's Roundup glyphosate herbicide. Absent Monsanto's improper conduct, actual and potential competitors would have been able to enter the market and compete with Monsanto on the merits. Had such competition not been unlawfully foreclosed by Monsanto, free and unfettered competition would have forced Monsanto to lower its prices for Roundup herbicides to competitive levels. As a consequence, ACGA members have sustained substantial losses and damage to their business and property.

83.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. ACGA and its members have no adequate remedy at law.

## COUNT II

### Claim for Injunctive Relief Under 15 U.S.C. §26
### Sherman Act § 2 - Unlawful Monopolization
### Monsanto's Unlawful Use/Leveraging of its Seed Trait Monopolies to Eliminate
### Competition in the Glyphosate Herbicide Market

84.    Plaintiff realleges the factual allegations of the preceding paragraphs of this complaint and incorporates them into this Court as if fully set out in full herein.

85.    Monsanto has monopoly power in the relevant markets for biotechnology seed traits, including the market for glyphosate-tolerant seed traits.

86.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monsanto has wilfully and unlawfully maintained and exercised its monopoly power in the relevant markets referred to above by seeking to foreclose competition or to gain a competitive advantage in the glyphosate herbicide market (or alternatively the non-selective herbicide market) by the coercive, exclusionary and anticompetitve conduct set forth above.

87.    As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has maintained its monopoly or market power in the glyphosate herbicide market (or alternatively has acquired and/or maintained its monopoly or market power in the non-selective herbicide market), and competition in that market has been unlawfully eliminated or foreclosed.

88.    There is no legitimate business justification for the actions and conduct through which Monsanto unlawfully maintained and exercised its monopoly power in the relevant markets set forth above.

89.    As purchasers of Monsanto's glyphosate herbicides sold under the brand name Roundup (as well as other brands), members of ACGA have been injured in their business and

property as a result of Monsanto's aforesaid violations of §2 of the Sherman Act. Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides, and Monsanto would have been forced to lower its prices for Roundup (and its other brands) to competitive levels.

90.     Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. ACGA and its members have no adequate remedy at law.

### COUNT III

### Claim for Injunctive Relief Under 15 U.S.C. §26
### Sherman Act § 2 - Unlawful Monopolization
### Monsanto's Unlawful Acquisition and/or
### Maintenance of its Glyphosate Herbicide Monopoly

91.     Plaintiff realleges the factual allegations of the preceding paragraphs of this complaint and incorporates them into this Court as if fully set out in full herein.

92.     Monsanto has monopoly power in the glyphosate herbicide market.

93.     In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monsanto has wilfully and unlawfully maintained its monopoly power in the glyphosate herbicide market through the coercive, exclusionary and anticompetitve conduct set forth above.

94.     As a result of Monsanto's willful and unlawful monopolistic conduct, Monsanto has maintained monopoly or market power in the glyphosate herbicide market, and competition in that market has been unlawfully eliminated or foreclosed.

95.     There is no legitimate business justification for the actions and conduct through which Monsanto unlawfully maintained and exercised its monopoly power in the relevant markets set forth above.

34

96.    As purchasers of Monsanto's herbicides and Monsanto's glyphosate herbicides sold under the brand name Roundup (as well as other brands), members of the ACGA have been injured in their business and property as a result of Monsanto's aforesaid violations of §2 of the Sherman Act. Absent Monsanto's anticompetitive and unlawful conduct, actual and potential competitors would have been able to enter and freely compete in the market for glyphosate herbicides and Monsanto would have been forced to lower its prices for Roundup (and its other brands) to competitive levels.

97.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  ACGA and its members have no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendant Monsanto Company and requests the following relief:

A.    That the Court find and declare that Monsanto has committed the violations of federal antitrust law as alleged herein;

B.    That the Court enter a judgment against Monsanto and enjoin Monsanto's continued violation of federal antitrust law pursuant to 15 U.S.C. §26;

C.    That the Court order Monsanto to pay the costs of this action, including but not limited to plaintiff's attorneys' fees; and

35

D.    That the Court award such other and further relief as this Court may deem just and

proper.

By:    _____

Jeffrey S. Goddess (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
*Attorney for Plaintiff ACGA*

**_Additional Plaintiff's Counsel_**

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Noah H. Silverman
Joseph Opper
1501 Broadway, Suite 1416
New York, NY 10036
Tel:  (212) 398-0055
Fax: (212) 764-6620

ODOM & DES ROCHES, LLP
Stuart E. Des Roches
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric Cramer
1622 Locust Street
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604

KOZYAK TROPIN & THROCKMORTON, P.A.
Adam Moskowitz
T. Tucker Ronzetti
David M. Buckner
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

PERCY, SMITH & FOOTE, LLP
David P. Smith
W. Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

Michael Miller
Law Office of Michael Miller
926 Chulie Drive
San Antonio, TX  78216
Tel: 210-225-6666
Fax: 210-225-2300

36

Lance A. Harke, Esq.
HARKE & CLASBY, LLP
155 S. Miami Avenue, Suite 600
Miami, FL 33130
Tel:  305-536-8220
Fax: 305-536-8229

Roger C. Bolin, Esq.
BOYLE & BOLIN ATTORNEYS AT LAW
227 E. Court St.
Hennepin, IL 61327
Tel:    815-925-7393
Fax:    815-925-7561

37

☙JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

**AMERICAN CORN GROWERS ASSOCIATION**

**DEFENDANTS**

**MONSANTO COMPANY**

(b) County of Residence of First Listed Plaintiff **District of Columbia**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number) **(302) 656-4433**
**Jeffrey S. Goddess, Esq., Rosenthal, Monhait & Goddess, P.A., Wilmington, DE 19899**

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | **PERSONAL INJURY** ☐ 362 Personal Injury - Med. Malpractice | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| | ☐ 365 Personal Injury - Product Liability | | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) |
| ☐ 195 Contract Product Liability | | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 380 Other Personal Property Damage | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): **Sherman Act, 15 USC §§ 1&2.** Civil antitrust action by association of farmers seeking
Brief description of cause: **injunctive relief against defendants' monopolization of market for glyphosate-based herbicides. (Sold as Roundup.)**

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

**06-599 SLR**

JUDGE

DOCKET NUMBER **06-600 SLR/04-305 SLR**

DATE **2/21/07**

SIGNATURE OF ATTORNEY OF RECORD
**Jeffrey S. Goddess (No. 630)**
**PO Box 1070, Wilmington, DE 19899**

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. ___0 7 - 1 0 0_____

# ACKNOWLEDGMENT
## OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

___2/21/07___
(Date forms issued)

_____
(Signature of Party or their Representative)

___Scott Rosenfield___
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action