# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AMERICAN CORN GROWERS ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 07-100-SLR |
| MONSANTO COMPANY, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT MONSANTO COMPANY'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND FOR LACK OF STANDING

OF COUNSEL:

Peter E. Moll
John J. Rosenthal
Scott Flick
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel: (202) 783-0800
Fax: (202) 383-6610

Kenneth A. Letzler
Jonathan I. Gleklen
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Tel: (202) 942-5000
Fax: (202) 942-5454

Dated: March 13, 2007
783320 / 31255

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market St.
Wilmington, DE 19801
Tel: (302) 984-6000
Fax: (302) 658-1192
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Monsanto Company*

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ................................................................................2

STATEMENT OF RELEVANT FACTS .......................................................................5

    A.    The Related *Pullen* and *Wade* Cases ........................................................5

    B.    ACGA and Its Members ..............................................................................5

    C.    ACGA's Complaint .....................................................................................8

    D.    ACGA's Attack on Monsanto's Technology Agreement............................9

    E.    The Technology Agreement Contains a Mandatory Forum
        Selection Clause.......................................................................................10

ARGUMENT ...............................................................................................................11

I.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT
      FALLS WITHIN THE SCOPE OF A FORUM SELECTION
      CLAUSE REQUIRING THE SUIT TO BE BROUGHT IN ST.
      LOUIS...................................................................................................11

    A.    ACGA Purports to Stand In the Shoes of Its Members and,
        Therefore, Is Bound by the Same Forum Selection Clause.......................12

    B.    Closely Related Parties Are Subject to the Forum Selection
        Clause Regardless of Whether or Not They Are Actual
        Signatories................................................................................................13

    C.    The Forum Selection Clause Is Valid, Binding, and
        Enforceable ...............................................................................................14

    D.    The Claims Against Monsanto Arise Out of and Are
        Connected with the Technology Agreement...............................................15

II.    ACGA LACKS STANDING TO BRING THIS ACTION ...................................16

    A.    ACGA Lacks Standing to Sue in Its Own Right .......................................17

    B.    ACGA Lacks Antitrust Standing in Light of More Direct
        "Victims" Pursuing the Same Alleged Antitrust Violation ......................19

    C.    ACGA Also Lacks Standing to Sue on Behalf of Members.....................21

1.    The Interests ACGA Seeks to Protect Do Not
Appear to Be "Germane" to the Organization's
Purpose....................................................................................21

2.    A Conflict of Interest Among the Association's
Members Compels Significant Participation by Its
Members ................................................................................22

D.    The Filing of This Action Raises a Serious Question Arises
About the Ability of Counsel to Pursue the Divergent
Interests of ACGA and the Putative Class Members.................................24

E.    If Any Question Remains as to ACGA's Lack Of Standing,
the Court Should Permit Monsanto to Take Limited
Jurisdictional Discovery.........................................................................25

CONCLUSION.............................................................................................27

# TABLE OF AUTHORITIES

## CASES

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.,*
    369 F.3d 732 (3d Cir. 2004)..................................................................19

*Adkins v. Rumsfeld,*
    450 F. Supp. 2d 440 (D. Del. 2006)...............................................16, 17

*Alberta Gas Chem. Ltd. v. E.I. du Pont de Nemours and Co.,*
    826 F.2d 1235 (3d Cir. 1987)................................................................18

*America Civil Liberties Union v. Bozardt,*
    539 F.2d 340 (4th Cir. 1976) ...............................................................12

*American Corn Growers Ass'n v. Monsanto,*
    C.A. No. 07-100-SLR (D. Del. filed Feb. 21, 2007) .........................1

*Associated Gen. Contractors v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983)...................................................3, 19, 20, 24

*Associated Gen. Contractors of North Dakota v. Otter Tail Power Co.,*
    611 F.2d 684 (8th Cir. 1979) ....................................3, 18, 19, 23

*Buck v. Hampton Twp. Sch. District,*
    452 F.3d 256 (3d Cir. 2006).................................................................11

*Cargill, Inc. v. Monfort of Colo., Inc.,*
    479 U.S. 104 (1986)..............................................................................20

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002)..................................................................11

*City of Pittsburgh v. West Penn Power Comp.,*
    147 F.3d 256 (3d Cir. 1998)..................................................................19

*Coastal Steel Corp. v. Tilghman Wheelbrator, Ltd.,*
    709 F.2d 190 (3d Cir. 1983)...........................................................13, 16

*Crescent Int'l Inc. v. Avatar Cmtys, Inc.,*
    857 F.2d 943 (3d Cir. 1988)..................................................................11

*Davis v. Kraft Foods North America,*
    No. 03-6060, 2006 U.S. Dist. LEXIS 3512 (D. Pa. Jan. 31, 2006) ...............25

*Doe v. Goldstein's Deli,*
    82 Fed. App'x. 773 (3d Cir. 2003)................................................................26

*Dow Chem. Co. v. Exxon Corp.,*
    30 F. Supp. 2d 673 (D. Del. 1998)................................................................17

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990)................................................................17

*Georgine v. Amchem Prod.,*
    83 F.3d 610 (3d Cir. 1996)................................................................25

*Gotha v. United States,*
    115 F.3d 176 (3d Cir. 1997)................................................................17

*Gould Elec. Inc. v. United States,*
    220 F.3d 169 (3d Cir. 2000)................................................................17

*Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.,*
    949 F. Supp. 1427 (N.D. Cal. 1997)................................................................13

*Green v. Warden, U.S. Penitentiary,*
    699 F.2d 364 (7th Cir. 1983)................................................................11

*Hay Acquisition Co., Inc., v. Schneider,*
    No. Civ. A. 2:04-CV-1236; 2005 WL 1017804 (E.D. Pa. Apr. 27, 2005) ................14

*Hodgson v. Gilmartin,*
    No. 06-1944, 2006 WL 2707397 (E.D. Pa. Sept. 18, 2006)................................14

*Hunt v. Washington State Apple Adver. Comm'n,*
    432 U.S. 333 (1977)................................................................ *passim*

*In re Intel Corp. Microprocessor Antitrust Litig.,*
    452 F. Supp. 2d 555 (D. Del. 2006)................................................................17

*John Wyeth & Brother Ltd. v. Cigna Int'l Corp.,*
    119 F.3d 1070 (3d Cir. 1997)................................................................15

*Kehr Packages v. Fidelcor, Inc.,*
    926 F.2d 1406 (3d Cir. 1991)................................................................26

*Kotan v. Pizza Outlet, Inc.,*
    400 F. Supp. 2d 44 (D.D.C. 2005)................................................................12, 13

*Lauro Lines S.R.L. v. Chasser,*
    490 U.S. 495 (1989)................................................................13

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
    998 F.2d 1144 (3d. Cir. 1993)...............................................19, 20

*Marano Enters. of Kansas. v. Z-Teca Rests., L.P.,*
    254 F.3d 753 (8th Cir. 2001) ...............................................14

*Massachusetts Sch. of Law at Andover v. America Bar Ass'n,*
    107 F.3d 1026 (3d Cir. 1997)................................................25

*McNair v. Monsanto Co.,*
    279 F. Supp. 2d 1290 (M.D. Ga. 2003) ...............................14

*Monsanto v. Baumgardner,*
    No. 04-708-ERW (E.D. Mo. Mar. 29, 2005) ......................11

*Mortensen v. First Federal Sav. & Loan Ass'n,*
    549 F.2d 884 (3d Cir. 1977)................................................17

*National Collegiate Athletic Ass'n v. Califano,*
    622 F.2d 1382 (10th Cir. 1980) ..........................................23

*Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.,*
    636 A.2d 892 (Del. 1994) ....................................................22

*Pennsylvania Prot. and Advocacy, Inc. v. Houston,*
    136 F. Supp. 2d 353 (E.D. Pa. 2001) ..................................18

*Polaroid Corp. v. Disney,*
    862 F.2d 987 (3d Cir. 1988)................................................23

*Pryor v. National Collegiate Athletic Ass'n,*
    288 F.3d 548 (3d Cir. 2002)................................................11

*Pullen Seeds and Soil v. Monsanto,*
    C.A. No. 06-599-SLR (D. Del. filed on Sept. 26, 2006) ................1

*RMI Titanium Co. v. Westinghouse Elec. Corp.,*
    78 F.3d 1125 (6th Cir. 1996) ..............................................17

*Salovaara v. Jackson Nat'l Life Ins., Co.,*
    246 F.3d 289 (3d Cir. 2001).................................................11

*Schoenbaum v. E.I. du Pont de NeMours and Co.*,
  No. 4:05-CV-01108-ERW (E.D.Mo.)...........................................................................8

*Singleton v. Wulff*,
  428 U.S. 106 (1976)..............................................................................................20, 21

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
  No. 06-102, 2007 WL 632763 (U.S. Mar. 5, 2007)........................................................1

*Southmark Prime Puls, LP v. Falzone*,
  776 F. Supp. 888 (D. Del. 1991)................................................................................11

*Swiger v. Allegheny Energy Supply Co., LLC*,
  C.A. No. 05-cv-5725, 2006 U.S. Dist. LEXIS 32059 (D. Pa. May 18, 2006)...............26

*TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*,
  915 F.2d 1351 (9th Cir. 1990) ....................................................................................14

*United States v. Lore*,
  430 F.3d 190 (3d Cir. 2005).........................................................................................13

*Wade Farms et al. v. Monsanto*,
  No. 06-600-SLR (D. Del. filed on Sept. 26, 2006).........................................................1

*Warth v. Seldin*,
  422 U.S. 490 (1975)...............................................................................................16, 24

## STATUTES

15 U.S.C. § 26 .............................................................................................................3, 20

Fed. R. Civ. P. 12(b)(1)............................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)..............................................................................................1, 11

Fed. R. Civ. P. 23(a)(4)...............................................................................................4, 25

Pursuant to Rules 12(b)(6) and 12(b)(1), Monsanto moves to dismiss the American Corn Growers Association (ACGA) Complaint because it was brought in the wrong forum by a party that lacks standing to sue. The infirmities in ACGA's Complaint arise in large part because it is virtually a carbon copy of two putative class actions recently filed in this Court against Monsanto captioned *Pullen Seeds and Soil v. Monsanto*, C.A. No. 06-599-SLR (D. Del. filed on Sept. 26, 2006), and *Wade Farms v. Monsanto*, C.A. No. 06-600-SLR (D. Del. filed on Sept. 26, 2006).[1] The subsequent and virtually identical *ACGA* Complaint should be dismissed on two independent grounds.

First, the *ACGA* Complaint was brought in the wrong forum by an association purportedly acting on its behalf and on behalf of 10,000 growers, all of which are bound by a contractual obligation to pursue this action only in St. Louis. ACGA should not be permitted to use this associational action as a tactical means to circumvent the forum selection clause of the Technology Agreements and the motion to dismiss currently pending before this Court in the related *Pullen* and *Wade* actions.[2]

Second, should the Court determine that this is a permissible forum, it would be necessary to decide the jurisdictional issue of standing before the case could proceed. In this regard, ACGA lacks standing to sue on its behalf or on behalf of many of the same grower members who are now putative class members in the *Pullen* and *Wade* actions.

---

[1] This case was filed as a related action to both *Pullen* and *Wade. American Corn Growers Ass'n v. Monsanto*, C.A. No. 07-100-SLR, (D. Del. Filed Feb. 21, 2007) (D.I. 1-1 Civil Cover Sheet).

[2] This Court has discretion to dismiss this case based on the forum selection clause, and to allow the question of standing to be determined by the court designated in the Technology Agreement. *See Sinochem Int'l Co. Ltd. v. Malaysis Int'l Shipping Corp.*, No. 06-102, 2007 WL 632763 (U.S. Mar. 5, 2007).

## SUMMARY OF THE ARGUMENT

1.    Fully briefed in *Pullen* and *Wade*, the application of the forum selection clause compels the dismissal of ACGA's Complaint for the following reasons.

      a.    The plaintiffs in *Pullen* and *Wade* are parties to Monsanto's Technology Agreement, which binds them to sue only in St. Louis. The same is true of many of AGCA's members. Because ACGA purports to sue on behalf of its members, it is subject to the same defenses and obligations as they are.

      b.    A plaintiff who did not sign a contract containing a forum selection clause is still bound where its claims are closely related to those of the signatories. If ACGA in fact can represent its members in this suit, there would necessarily be such a relationship.

      c.    ACGA's lawsuit is a transparent attempt to evade the contractual obligations of its members and to circumvent the motion to dismiss enforcing those obligations. Indeed, plaintiff's counsel essentially admitted as much when, apropos of nothing, they noted in recent *Pullen* and *Wade* filings that ACGA "is not signatory to the Technology User Agreement which contains the forum selection clause central to defendant's motions in *Pullen* and *Wade Farms*." *Pullen* (D.I. 14, Mot. For Order Setting Scheduling Conf., ¶6); *Wade* (D.I. 12, Mot. For Order Setting Scheduling Conf., ¶6).

2.    The case independently should be dismissed under Fed. R. Civ. P.

12(b)(1) because ACGA lacks standing:

a.    ACGA lacks antitrust standing to sue on *its own behalf*

because it does not allege an injury to itself. *See*

*Associated Gen. Contractors of N.D. v. Otter Tail Power*

*Co.*, 611 F.2d 684 (8th Cir. 1979) (upholding district

court's dismissal of an association's claims filed on its

own behalf because, other than conclusory allegations, the

organization alleged injury only to its members).

b.    ACGA lacks antitrust standing because, under the test

articulated by the U.S. Supreme Court in *Associated*

*General Contractors*, there are more direct alleged

"victims" that are better equipped to pursue this action.

*Associated Gen. Contractors of Cal. v. Cal. State Council*

*of Carpenters*, 459 U.S. 519 (1983). Many of ACGA's

grower members are subsumed in the definition of the

putative class alleged in the virtually identical *Pullen* and

*Wade* actions and seek the same injunctive relief under 15

U.S.C. § 26.

c.    ACGA lacks standing to sue on behalf of its members

under the Supreme Court's three-prong test articulated in

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S.

333, 343 (1977):

3

    i.     This antitrust action does not appear to be germane to the organization's purpose.

    ii.    A conflict of interest exists among ACGA's members. An association may only sue on behalf of its members when the individual members' participation is not required. Here, the relief requested in this lawsuit would be contrary to the interests of ACGA's organic farming members who benefit from higher glyphosate prices, thereby necessitating the participation of its members.

d.    To allow this case to proceed would raise serious issues affecting the viability of *Pullen* and *Wade*. Counsel cannot represent parties with antagonistic interests in two different actions – ACGA's farmer members that promote organic farming and oppose the use of genetically-modified seed and non-organic herbicides versus a putative class of farmers seeking to enjoin actions that have purportedly raised the price of glyphosate and genetically modified seed. This conflict precludes the ability of the class to satisfy the requirements of Rule 23(a)(4).

e.    If any question remains as to ACGA's lack of standing, the Court should permit Monsanto to engage in limited jurisdictional discovery.

## STATEMENT OF RELEVANT FACTS

### A.    The Related *Pullen* and *Wade* Cases

In September 2006, Pullen and Wade each filed identical purported class actions

against Monsanto. *Pullen* (D.I. 1); *Wade* (D.I. 1). The *Pullen* and *Wade* complaints are

brought on behalf of a purported Federal Injunctive Class defined as:

> All persons and entities (excluding Monsanto and its officers, directors
> and employees, coconspirators and governmental entities) who purchased
> Monsanto's Roundup herbicides in the United States for commercial
> agricultural purposes at any time from September 26, 2002 to the present.

*Pullen* (D.I. 1, Compl. ¶20); *Wade* (D.I. 1, Compl. ¶22). *Pullen* and *Wade* allege that

Monsanto used its alleged monopoly in biotech traits as leverage to monopolize the

herbicide market, in which Monsanto sells its glyphosate-based herbicide - "Roundup."

*Pullen* (D.I. 1, Compl. ¶¶ 77-92); *Wade* (D.I. 1, Compl. ¶¶ 79-94). *Pullen* and *Wade*

claim that, as a result, Monsanto charged super-competitive prices for Roundup. *Id.*

Monsanto has moved to dismiss both *Pullen* and *Wade* because those claims are

governed by a forum selection clause in their Technology Agreements with Monsanto

that requires the suits to be brought in St. Louis, Missouri. *Pullen* (D.I. 7); *Wade* (D.I. 5).

### B.    ACGA and Its Members

ACGA is an organization registered in Washington, D.C., which claims no

relationship to this forum. The Complaint alleges that ACGA was founded in 1987 and is

a "voluntary membership organization, representing the interests of farmers in 35 states."

*ACGA* (D.I. 1- Compl. ¶2). While ACGA purports to have "nearly 10,000 members," the

Complaint fails to identify a single one. *ACGA* (D.I. 1, Compl.). ACGA claims not to

"oppose the development or use of either genetically-modified crops or glyphosate

herbicide within a market that gives consumers choices regarding the agricultural

products they purchase." *Id.* (Compl. ¶3). In fact, the Complaint asserts that "ACGA members purchased Roundup for commercial agricultural purposes at non-competitive and artificially inflated prices, and were injured as a result." *Id.* (Compl. ¶70).

However, there is a wealth of contrary evidence in the public domain indicating that ACGA is an organization dedicated to organic farmers,[3] who do not plant genetically-modified crops such as Monsanto's Roundup Ready Corn and do not use conventional herbicides such as glyphosate in their weed control systems.[4] "ACGA's membership consists of farmers who have opted never to use genetic improvement technology." Rosenthal Decl., ¶5; ActivistCash.com website. For example, one third-party organization describes ACGA's mission in very different terms than as alleged in the Complaint:

> Founded in 1987, ACGA masquerades as a representative of the United States many traditional corn growers. But the ACGA is really an organization that promotes a radically anti-business view of agriculture . . .
>
> ACGA hopes farmers and consumers will confuse it with the National Corn Growers Association (NCGA), the much larger mainstream

---

[3]   Monsanto has ascertained certain facts relating to ACGA from the public record, which are set forth in more detail in the Declaration of John Rosenthal that accompanies this motion. However, the publicly available facts are limited in nature, and often obtained from third-party sources. *See infra* Section III.

[4]   Rosenthal Decl., ¶¶3, 5-7 (*see, e.g.*, http://www.treehugger.com/files/2005/08/ the_emergence_o.php. This article discusses the additional costs for non-organic farmers associated with the emergence of glyphosate-tolerant weeds. *See also* http://www.activistcash.com/organization_overview.cfm/oid/42 ("ACGA's real purpose is to promote organic corn and its producers, and to trash-talk genetically improved foods."); http://southwestfarmpress.com/mag/farming_biotech_effectiveness_com (quoting NCGA CEO Rick Tolman as saying, "ACGA has much stronger ties to and support from the environmental extremists than they do from actual corn producers in the United States. They are not credible representatives for U.S. corn growers."); and "Truth Takes a Detour," http://www.consumerfreedom.com/news_detail._cfm?headline=306 ("[t]he idea that ACGA is "neutral" and not influenced by radical anti-choice environmentalists is anything but truthful… ")).

organization that really represents corn growers. Unlike the ACGA, which has a Politburo-style structure in which the groups leaders issue position statements by fiat, the NCGA actually promotes policies set by its rank and file.

ACGA's real purpose is to promote organic corn and its producers, and to trash-talk genetically improved foods. Rather than concentrate on issues important to family farmers, ACGA's leaders and spokespeople travel around the world to work with Greenpeace, the fringe Natural Law Party (NLP), and other anti-food-technology organizations on activist campaigns targeting corporate agriculture.

ACGA and the Foundation are tied to most of the usual anti-capitalist suspects in the anti-genetic improvement movement (including the Campaign to Label GE Foods, the Center for Food Safety, Consumers Union, Environmental Media Services, Food First, Jeremy Rifkin's Foundation on Economic Trends, Friends of the Earth, Greenpeace, the Institute for Agriculture and Trade Policy, Maharishi University of Management, the Natural Law Party, the Organic Farming Research Organization, the Pesticide Action Network, the Sierra Club, and Union of Concerned Scientists) through the Bolinas Group, an informal consortium of environmental and anti-biotech organizations that helps fund ACGA.

*Id.*

In fact, much of ACGA's funding comes from foundations that oppose genetically modified crops. For instance, ACGA received a grant from the John Merck Fund in 2002 for $60,000. Rosenthal Decl. ¶10; ActivistCash.com website. The purpose of the grant was "to reduce the number of planted acres of genetically engineered corn by providing objective information to farmers about the many uncertainties that growing such crops present." *Id.* In 2006 alone, The Merck Fund gave out $6.484 million, fifty percent of its budget, to environmental programs. Rosenthal Decl. ¶11; John Merck Fund website. The Merck Fund supports programs that "educate the public, the media, farmers and policymakers about the health and environmental questions raised by genetically engineered food and agriculture." Rosenthal Decl. ¶12; John Merck Fund website.

Between 1999 and 2002, ACGA received $280,000 in funding from the Merck Fund. Rosenthal Decl. ¶10; ActivistCash.com website.

ACGA also received funding from FarmAid, which is vehemently opposed to genetically-modified crops. *Id.* FarmAid's website calls genetically modified crops "a public health hazard," which is "threatening farmers worldwide." Rosenthal Decl. ¶13; FarmAid.com website. ACGA uses grants from these foundations to run programs such as the ACGA's Farmer's Choice - Customer First program, which "educates" farmers about the dangers of growing genetically-modified crops and their potential impact on the marketability of the farmers' crops. Rosenthal Decl. ¶14; ACGA website.

### C.    ACGA's Complaint

On February 21, 2007, ACGA sued Monsanto "on behalf of itself and its nearly 10,000 [farmer] members," including at least some that plant genetically modified corn, soybean, and other seed containing genetic traits patented by Monsanto. *ACGA* (D.I - Compl. p. 1, ¶2). As do thirteen cases pending before the federal district court in St. Louis and the *Pullen* and *Wade* cases, ACGA alleges that Monsanto has engaged in anticompetitive activity regarding the licensing of its genetically modified seeds and traits. *See Schoenbaum v. E.I. du Pont de NeMours and Co*, No. 4:05-CV-01108-ERW (E.D.Mo.) (D.I. 71, 102) (thirteen cases filed in 2004, transferred to Missouri in 2005 and consolidated).[5] More specifically, ACGA alleges that Monsanto leveraged its alleged monopoly in biotech traits to charge super-competitive prices for Roundup. *ACGA* (D.I.

---

[5]    ACGA's Complaint is copied in large part from the *Pullen* and *Wade* complaints, which, in turn, apparently were modeled on the complaints in the St. Louis *Schoenbaum* litigation. The chart attached as Exhibit 13 to the Rosenthal Decl. highlights the parallels among the various complaints.

1, Compl. ¶77). ACGA's Complaint avers that "ACGA members purchased Roundup for commercial agricultural purposes at non-competitive and artificially inflated prices, and were injured as a result." *Id.* (Compl. ¶15).

### D.     ACGA's Attack on Monsanto's Technology Agreement

As growers of genetically-modified seed containing Monsanto's traits, ACGA members – like the plaintiffs in *Pullen* and *Wade* – had to execute a standard license, called a Technology Agreement, to use seed containing Monsanto's patented technologies.[6] According to ACGA, "Monsanto has also imposed exclusionary and restrictive conditions at the grower level that prevent growers from using generic glyphosate in connection with Monsanto's glyphosate tolerant seed traits." *Id.* (Compl. ¶70). In particular, ACGA alleges, in the same vein as in the St. Louis cases and in precisely the same words as in *Pullen* and *Wade*, "Monsanto requires growers to sign a technology license . . . that effectively mandates that they use only Roundup herbicides" on seeds containing Monsanto's patented traits. *Id.*

As in the St. Louis cases and *Pullen* and *Wade*, ACGA alleges that Technology Agreements from 1998 to 2000 improperly "conditioned the grant of a license to use its Roundup Ready seed technology on the grower's agreement to purchase and use only Roundup herbicide." *Id.* Further, as the plaintiffs did in St. Louis and in *Pullen* and *Wade,* ACGA claims that:

> While the language in Monsanto's more recent [Technology Agreements] appear[s] to permit a grower to use a non-Roundup glyphosate herbicide in connection with Monsanto's glyphosate-tolerant seed traits, other aspects of the Grower's Agreement demonstrate that this 'choice' is

---

[6]    Indeed, members of the Board of Directors of ACGA signed Technology Agreements with Monsanto. *See* Rosenthal Decl. ¶18.

illusory and that a grower is still effectively locked into using Roundup
virtually exclusively.

*Id.* (Compl. ¶71).

Indeed, ACGA alleges that "Monsanto has effectively maintained the same

condition in its technology license that requires a grower using Monsanto's

biotechnology seed traits to use Roundup virtually exclusively rather than a cheaper

generic glyphosate herbicide." *Id.* (Compl. ¶74). ACGA further claims that "[t]he effect

of these unlawful agreements and monopolistic conduct has been to foreclose

competition in the glyphosate herbicide market." *Id.* (Compl. ¶77). These allegations,

too, are drawn from the *Pullen* and *Wade* complaints and are parallel to claims advanced

in the St. Louis cases.

### E.    The Technology Agreement Contains a Mandatory Forum Selection Clause

The Technology Agreements that ACGA attacks contain a forum selection clause

designating St. Louis courts as the exclusive forum for this litigation:

> THE PARTIES CONSENT TO THE SOLE AND EXCLUSIVE
> JURISDICTION AND VENUE OF THE U.S. DISTRICT COURT FOR
> THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION,
> AND THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS,
> MISSOURI, (ANY LAWSUIT MUST BE FILED IN ST. LOUIS, MO)
> FOR ALL CLAIMS AND DISPUTES ARISING OUT OF OR
> CONNECTED IN ANY WAY WITH THIS AGREEMENT AND THE
> USE OF THE SEED OR THE MONSANTO TECHNOLOGIES EXCEPT
> FOR COTTON-RELATED CLAIMS MADE BY THE GROWER.

*See* Rosenthal Decl. ¶19; 2007 Technology Agreement at 2.[7]

---

[7]    Monsanto uses a new Technology Agreement for each crop year, and the forum
clause language changed in non-material ways over time. The United States District
Court for the Eastern District of Missouri held that, because the Agreements provide that
they remain in effect until terminated and that continuing use of Monsanto's technologies
after new terms are issued constitutes an agreement to be bound by the new terms, the
forum clause in the most recent Technology Agreement applies. *Monsanto v.*

## ARGUMENT

I.    **THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FALLS WITHIN THE SCOPE OF A FORUM SELECTION CLAUSE REQUIRING THE SUIT TO BE BROUGHT IN ST. LOUIS**

The Court of Appeals for the Third Circuit has held that "a 12(b)(6) dismissal is a permissible means of enforcing a forum selection clause." *Salovaara v. Jackson Nat'l Life Ins., Co.*, 246 F.3d 289, 298 (3d Cir. 2001) (affirming dismissal of an action based on a forum clause requiring a state or federal court in another forum); *Crescent Int'l Inc. v. Avatar Cmtys., Inc.*, 857 F.2d 943, 944-45 (3d Cir. 1988) (similar).[8]

Although a court considering a motion under Fed. R. Civ. P. 12(b)(6) focuses on the pleadings, it can properly review contracts or other documents referenced in the complaint. *See Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). A court also can take judicial notice and consider matters such as pleadings in other cases, *see Southmark Prime Puls, LP v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991); *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983), and official government records. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). Applying this standard, ACGA's complaint should be dismissed for failure to state a claim.

---

*Baumgardner*, No. 4:04CV00708 ERW, Mem. and Order at 9 n.10 (E.D. Mo. Mar. 29, 2005)(Ex. 2-18). Accordingly, the forum clause in the 2007 Technology Agreement is applicable here. In any event, the question of which version of the Agreement applies is of no consequence, because the Complaint must be dismissed under any iteration.

[8]   A court also has power on its own motion to transfer a case to another federal forum should it determine that transfer, rather than dismissal, is the appropriate course. *Salovaara*, 246 F.3d at 299.

A.     **ACGA Purports to Stand In the Shoes of Its Members and, Therefore, Is Bound by the Same Forum Selection Clause**

When an organization sues on behalf of its members, it is bound by the forum selection clause they signed. *See Am. Civil Liberties Union v. Bozardt*, 539 F.2d 340, 343 (4th Cir. 1976). ACGA claims that it sues on "behalf of itself and its nearly 10,000 members." *ACGA* (D.I. 1, Compl. p. 1, ¶1). However, ACGA does not allege any injury that it has suffered. Therefore, its claims, if it has any, are as a representative of its members. Assuming that ACGA is a proper representative (and, as demonstrated below, it is not), it stands in the shoes of its members and is subject to the same procedural arguments to which its members are subject. *Bozardt*, 539 F.2d at 343 ("the organization's action for equitable relief would be subject to the same restrictions as [its member's] action, since its rights would be derived entirely from [its member's] rights.").

Courts repeatedly have recognized that forum selection clauses cannot be circumvented simply by having a non-signatory sue in a representative capacity. In *Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, (D.D.C. 2005), for instance, an individual who signed a franchise contract containing a forum selection clause brought a suit in the name of a partnership he created to operate the business. When the defendants sought to enforce the forum clause, the plaintiff argued that the clause was unenforceable because the partnership was a nonsignatory to the franchise agreement.

The court rejected this argument, reasoning that the signatory was the principal of the partnership and had established the partnership for the purpose of developing and operating the defendants' franchised pizza restaurants. *Id.* at 48. The partnership's claims thus "flow[ed] out of Kotan's interactions with the defendants." *Id.* at 49. The court therefore concluded: "Were this Court to rule that the forum selection clause does

12

not apply to MB Group, a plaintiff in a civil action could simply join a newly-formed corporation to its complaint to defeat an otherwise valid forum selection clause." *Id.; see also Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1434 (N.D. Cal. 1997) (holding that a corporation which is the assignee of the rights of signatory to the forum selection clause is bound by the forum selection clause even though the corporation itself is not a signatory to the contract).

The situation here parallels *Kotan*. ACGA alleges that it was established for the purpose of "advocat[ing] on behalf of its farmer-members on issues including seed patents and genetically-modified organisms." *ACGA* (D.I. 1, Compl. ¶15). ACGA asserts claims that arose out of the interaction of ACGA members with Monsanto. *Id.* (Compl. ¶¶2-3, 10, 15, 69, 82-83, 89-90, 96-97). Members on whose behalf ACGA seeks to advocate – including officers and directors who control the organization – have entered into Technology Agreements containing valid and binding forum selection clauses. In this circumstance, substance, not form, governs. *See United States v. Lore*, 430 F.3d 190, 203 (3d Cir. 2005). ACGA members, and its counsel, cannot evade a valid and enforceable forum selection clause by means of such procedural maneuvering.

**B.  Closely Related Parties Are Subject to the Forum Selection Clause Regardless of Whether or Not They Are Actual Signatories**

As evidenced by the allegation in the Complaint that AGCA members planted genetically-modified corn, at least some of them entered into Technology Agreements with Monsanto. *See* Rosenthal Decl. ¶18. When a non-signatory third party is so closely related to the dispute that it was "foreseeable" that it would be bound by the forum selection clause, the clause should apply. *Coastal Steel Corp. v. Tilghman Wheelbrator, Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983), *abrogated on other grounds, Lauro Lines S.R.L.*

13

*v. Chasser*, 490 U.S. 495 (1989); *see also Marano Enters. of Kansas v. Z-Teca Rests., L.P.*, 254 F.3d 753, 757 (8th Cir. 2001) (non-signatory was "'closely related' to the disputes arising out of the agreements and properly bound by the forum-selection provisions.").[9] Moreover, courts have held that "[p]laintiffs cannot escape their contractual obligations simply by joining parties who did not sign the contract and then claiming that the forum selection clause does not apply." *Hodgson v. Gilmartin*, No. 06-1944, 2006 WL 2707397, at *13 n.14 (E.D. Pa. Sept. 18, 2006) (citations omitted); *see also TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*, 915 F.2d 1351, 1354 (9th Cir. 1990) ("It is not unreasonable or unjust to enforce the clause even though some of them did not sign the agreement."). Given AGCA's opposition to genetically-modified crops, some members undoubtedly did not sign Technology Agreements. But when an organization seeks to sue on behalf of some members who entered into a forum selection agreement and some who did not, it still cannot be a vehicle for evading the obligations of the signatories.

### C.    The Forum Selection Clause Is Valid, Binding, and Enforceable

Monsanto demonstrated in its briefs in *Pullen* and *Wade* that the forum selection clauses at issue here are "presumptively valid" and enforceable. *See Pullen* (D.I. 8 at 8); *Wade* (D.I. 6 at 8). The same arguments apply here, and we will not repeat them, as the Court's ruling in *Pullen* and *Wade* will control.

---

[9] *Hay Acquisition Co., Inc., v. Schneider*, No. Civ. A. 2:04-CV-1236; 2005 WL 1017804, at *8 (E.D. Pa. Apr. 27, 2005); *McNair v. Monsanto Co.*, 279 F. Supp. 2d 1290, 1303 (M.D. Ga. 2003) (a forum selection clause applied even to a non-party because it was "foreseeable" that claims of the non-party would relate to other claims subject to the clause).

Beyond those arguments, St. Louis is in an appropriate forum because it is a key state for corn production and presumably therefore has more of the corn growers sought to be represented. *See* http://www.ers.usda.gov/publications/eib7/eib7.pdf.

### D.    The Claims Against Monsanto Arise Out of and Are Connected with the Technology Agreement

The forum selection clause here is broad and provides that "all claims and disputes arising out of *or connected in any way with* this agreement and the use of the seed or the Monsanto technologies" must be filed in St. Louis. *See* Rosenthal Decl. ¶19 (emphasis added). The Third Circuit has held that forum selection clauses that cover "disputes," as this one does, have a much broader scope than those that cover "claims" related to a contract. *John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997). The court also held that a clause using language such as "related to" – equivalent to the language "connected in any way with" in the Agreement here – makes the forum selection clause even more expansive. *Id.*.

Again, Monsanto briefed these points in *Pullen* and *Wade*. The arguments there apply with equal force here. The Court's ruling on the issue in *Pullen* and *Wade* will control. ACGA's allegations of wrongdoing are the same as in *Pullen* and *Wade*, and encompass the Technology Agreement. As discussed, ACGA claims that earlier versions of the Technology Agreement unlawfully compelled growers to purchase Roundup herbicide, that the current Agreement restrains trade, and that components of the fees paid under the Technology Agreement have resulted in overcharges for Roundup. *ACGA* (D.I. 1, Compl. ¶¶76-77). ACGA describes the Agreement as "exclusionary" and "restrictive," contends that it "effectively mandates that [farmers] use only Roundup herbicides on Roundup Ready crops," and complains that "the grower is still effectively

15

locked into using Roundup virtually exclusively." *Id.* (Compl. ¶¶70-72). These claims do not merely "arise under" the Agreement. They are explicitly predicated on it. They are not merely "connected with" the use of Monsanto's technology. They center on the alleged tie between the use of the technology and the purchase of Roundup. The Technology Agreement is the vehicle through which the alleged anticompetitive scheme was achieved.

As a matter of law, policy, and logic, there is no reason parties to a contract should be barred from agreeing on a forum for "any disputes" arising from a contract. To hold otherwise would allow a plaintiff to evade contractual obligations by means of artful pleading. *Coastal Steel*, 709 F.2d at 203 ("If forum selection clauses are to be enforced as a matter of public policy, that same public policy requires they not be defeated by artful pleading.").

## II.    ACGA LACKS STANDING TO BRING THIS ACTION

Federal courts hear only "cases" or "controversies" under Article III of the U.S. Constitution. Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Thus, motions to dismiss for lack of standing are proper under Rule 12(b)(1) because, if a plaintiff lacks standing, the Court is without subject matter jurisdiction over the case. *Adkins v. Rumsfeld*, 450 F. Supp. 2d 440, 444-47 (D. Del. 2006). In that regard, the plaintiff has the burden of establishing that it has standing. *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 558 (D. Del. 2006) ("the plaintiff must bear the burden of persuasion and establish that subject matter jurisdiction exists.") (internal citations omitted).

Moreover, "[i]t is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal citations omitted). "The court is not confined to allegations in the [ ] complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Dow Chem. Co. v. Exxon Corp.*, 30 F. Supp. 2d 673, 690 (D. Del. 1998) (internal citations omitted, citing *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997)). [10] As this Court stated in *Adkins v. Rumsfeld*, a "challenge under Rule 12(b)(1) permits the Court to expand its inquiry beyond the allegations of the Amended Complaint and consider matters outside the pleadings including the affidavits and other documents offered by Defendants to demonstrate that Plaintiff lacks standing to pursue his claim." 450 F. Supp. 2d at 446-47.   Thus, it is appropriate for this Court to consider the evidence that Monsanto has presented from the public record in deciding this motion.   That evidence and the relevant Supreme Court precedent make it clear that ACGA lacks standing to bring the claims set out in the Complaint.

## A.    ACGA Lacks Standing to Sue in Its Own Right

For an organization to have standing to sue on its own behalf, it must allege an injury to itself, separate and distinct from the purported injuries to its members.

---

[10]    *See also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891-892 (3d Cir. 1977); *see also RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) ("[T]he trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. ... [N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."); *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (district courts may consider extrinsic evidence and hold evidentiary hearings in resolving a Rule 12(b)(1) motion involving a factual challenge to the court's subject matter jurisdiction).

*Associated Gen. Contractors of N.D. v. Otter Tail Power Co.*, 611 F.2d 684, 687 (8th Cir. 1979) (a nonprofit trade association that brought suit both on its own behalf and in a representational capacity did not have standing in its own right to sue because it failed to indicate any injury personal to it); *see also Alberta Gas Chem. Ltd. v. E.I. du Pont de Nemours and Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987) ("A showing of antitrust injury is necessary but not always sufficient to establish antitrust standing."). Where the association does nothing more than make conclusory allegations of injuries to itself, the case must be dismissed for lack of standing.

In *Associated General Contractors*, for instance, a nonprofit trade association brought suit against two defendants on behalf of itself and its members for alleged antitrust violations. The organization alleged that it had "standing both in its own right and as a representative of its members" and contended that simply alleging "that the '[organization] brings this action in its own behalf,' and that '(u)nless enjoined, defendants will continue to . . .. enforce the Agreement to the irreparable injury of [the organization], its member contractors and the general public'" were sufficient to allege standing. *Associated Gen. Contractors of N.D.*, 611 F.2d at 687.

Affirming the district court's dismissal of the organization's claims for lack of standing, the Eighth Circuit found:

> [c]onclusory allegations are insufficient to make out a 'case or controversy' because they simply fail to indicate any injury personal to the [organization]. It is clear from the complaints and the affidavits that the [organization] is not a contractor and does not seek work on this or any other project. Thus, it is not injured in its own right by operation of the Stabilization Agreement.

*Id.*[11]

---

[11] Other courts have similarly held. *See Pa Prot. and Advocacy, Inc. v. Houston*, 136 F. Supp. 2d 353, 361 (E.D. Pa. 2001) (an organization has standing to sue on its own behalf

Here, ACGA alleges no injuries to itself distinct from those of its members. On the contrary, like the association in *Associated General Contractors*, it simply incorporates conclusory language into the Complaint such as "[ACGA] brings this action on behalf of itself" (*ACGA* (D.I. 1, Compl. p. 1)) and "ACGA and its members have no adequate remedy at law." *Id.* (Compl. ¶¶83, 90, 97). Such conclusory language is insufficient to satisfy standing requirements.

**B.      ACGA Lacks Antitrust Standing in Light of More Direct "Victims" Pursuing the Same Alleged Antitrust Violation**

In *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983), the Supreme Court established a balancing test for courts to analyze whether a party has antitrust standing.[12] Among the factors to be considered under the *Associated General Contractors* test is the "existence of more direct victims of the alleged [antitrust violations]." 459 U.S. at 545; *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993).[13] The Supreme Court articulated the rationale behind this factor as follows:

---

only if the organization itself can satisfy the irreducible constitutional minimum requirements for standing which include demonstrating injury in fact.

[12] *See also 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 740-41 (3d Cir. 2004) (quoting *City of Pittsburgh v. West Penn Power Comp.*, 147 F.3d 256, 264 (3d Cir. 1998), which refers to the *Associated General* antitrust standing test "as the passageway through which antitrust plaintiffs must advance").

[13] The five factors to be weighed under *Associated General Contractors* to determine the existence of antitrust standing are: (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) Whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of

> The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party [...] to perform the office of a private attorney general.

*Associated Gen. Contractors*, 459 U.S. at 542; *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) ("[t]he courts depend on effective advocacy, and therefore, should prefer to construe legal rights only when the most effective advocates of those rights are before them").

ACGA purports to be no more than itself and an association seeking to represent the interests of its grower members. These farmer members are not only the more direct "victims," but also plaintiffs in two virtually identical pre-existing mandatory putative class actions alleging that they allegedly paid the same artificially-high prices for Roundup because of Monsanto's anticompetitive scheme and the same supra-competitive prices for its Monsanto glyphosate herbicides. *Compare Pullen* (D.I. 1, Compl.); *Wade* (D.I. 1, Compl.); *with ACGA* (D.I. 1, Compl.). ACGA's complaint, like the *Pullen* and *Wade* complaints, seeks to enjoin Monsanto's allegedly anticompetitive practices under 15 U.S.C. §26. *Pullen* (D.I. 1, Compl.); *Wade* (D.I. 1, Compl.); *ACGA* (D.I. 1, Compl.). The purported class representatives in *Pullen* and *Wade* are represented by the same attorneys who represent ACGA in this suit. *Pullen* (D.I. 1, Compl.); *Wade* (D.I. 1, Compl.). Presumably, these growers who are members of ACGA are also members of the classes alleged in *Pullen* and *Wade*. It is these growers, not ACGA, that allegedly planted seeds with Monsanto's traits and purchased Roundup.

---

the alleged antitrust violations; and; (5) the potential for duplicative recovery or complex apportionment of damages. *Associated Gen. Contractors*, 459 U.S. at 545; *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d at 1165-66. Certain of these factor have no application of in the context of a claim solely for equitable relief. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110-11 (1986).

ACGA's grower members' claims, therefore, are wholly subsumed by the purported Federal Injunction Class in *Pullen* and *Wade*, which compels the conclusion that there is no need for ACGA to represent its members in an identical action acting as a private attorney general. *Singleton*, 428 U.S. at 115-16 ("Even where the relationship [between the third party and the organization seeking to sue on behalf of that party] is close, the reason for requiring persons to assert their own rights will generally still apply"). It is thus clear that the purpose for filing this lawsuit is not necessarily to vindicate the rights of AGCA members, but rather to make an end-run around the forum selection clauses. That is not a basis for antitrust standing.

## C.      ACGA Also Lacks Standing to Sue on Behalf of Members

ACGA also lacks standing to represent its members in this action.  In *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977), the Supreme Court articulated a three-prong test for standing with respect to an association seeking to sue on behalf of any of its members.  ACGA must show that: (i) its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are "germane" to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. ACGA fails to meet its burden to allege even one of these requirements.

### 1.      The Interests ACGA Seeks to Protect Do Not Appear to Be "Germane" to the Organization's Purpose

*Hunt* also requires that the interests that the association seeks to protect are "germane" to the organization's purpose. *Hunt*, 432 U.S. at 343.  While the hurdle to satisfy this requirement may not be extremely high, the alleged goals of this action and at

21

least one key purpose of ACGA appear to be diametrically opposed, demonstrating ACGA's inability to satisfy this requirement.[14]

On the one hand, the complaint seeks to redress certain alleged anticompetitive activity restraining the competition in the sale of glyphosate herbicide and genetically modified seeds that purportedly has resulted in overcharges to those farmers.  On the other hand, one reported purpose of ACGA is to promote organic farming, including opposition to the use of non-organic herbicides and genetically modified seeds. Moreover, AGCA, in seeking a tax exemption as a non-profit organization, told the Internal Revenue Service that its purpose was to "promote alternative uses of corn and byproducts."  Rosenthal Decl. ¶20.  This case has nothing to do with that purpose.

The only interest that this action seems to serve is to continue ACGA's longstanding battle with companies that offer such products, such as Monsanto. Ironically, the only grower members of ACGA who could possibly form any basis for conferring standing on ACGA are those members who use genetically modified seeds and Roundup in contravention of ACGA's apparent purpose.

## 2.    A Conflict of Interest Among the Association's Members Compels Significant Participation by Its Members

The inherent conflicts between ACGA members require dismissal of this case for lack of standing.  The third prong of the *Hunt* test requires that neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit.

---

[14] *See Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.,* 636 A.2d 892, 902 (Del. 1994) ("The question whether one's interest is germane is 'undemanding' and requires only 'mere pertinence between the litigation subject and organizational purpose.'").

*Hunt*, 432 U.S. at 343. This requirement cannot be satisfied where conflicts of interest exist among the members that would necessarily require the participation of the individual members in order to ensure the adequate representations of their divergent interests within the organization. *Polaroid Corp. v. Disney*, 862 F.2d 987, 999 (3d Cir. 1988) ("associational standing has never been granted in the presence of serious conflicts of interest either among the members of an association or between an association and its members").[15]

Given the known facts concerning ACGA's membership generally and the assertions of the Complaint, there is an apparent and severe schism between the interests of ACGA members who are organic farmers and who do not use Roundup or other glyphosate herbicides and members who are non-organic farmers. More specifically, ACGA claims that Monsanto's alleged anticompetitive conduct affected *exclusively* those "*farmers who wish to spray herbicides over their crops*, [for whom] only competing glyphosate herbicides can act as a constraint on the price of Monsanto's glyphosate products . . . ." *ACGA* (D.I. 1, Compl. ¶21)(emphasis added). However, the publicly available facts demonstrate that at least some, if not a majority, of ACGA's members are organic growers who plant conventional crops and employ only tillage systems or alternative selective herbicide systems, if any. Use of glyphosate-based herbicides such

---

[15] *See also Associated Gen. Contractors*, 611 F.2d at 691 ("The association is clearly not in a position to speak for its members on the question of whether the [conduct] is violative of the antitrust laws. Their status and interests are too diverse and the possibilities of conflict too obvious to make the association an appropriate vehicle to litigate the claims of its members."); *Nat'l Collegiate Athletic Ass'n v. Califano*, 622 F.2d 1382, 1391-92 (10th Cir. 1980) (holding that there is no associational standing if more members oppose the association's position than support it, or where "it is not clear which side of the lawsuit the association's members would agree with").

as Roundup would be anathema to these organic growers. ACGA's organic growers compete directly with ACGA's non-organic growers.

If ACGA's non-organic members had been the victim of artificially high input prices of their transgenic crops and glyphosate-based weed control systems, they consequently would face either lower profit margins or would have to charge higher prices for their end products. Organic growers have an interest in their competitors' facing higher costs. Thus, ACGA's organic growers would have actually *profited* from increased crop input costs faced by their non-organic grower competitors who used Roundup. The internal conflict of interest between ACGA's organic and non-organic growers makes individualized participation of association members indispensable, and thus, ACGA fails the third prong of the *Hunt* standing test. *See also Warth*, 422 U.S. at 511 (organizations do not have standing to litigate members' harm if individual participation of each injured party is indispensable).

Here, the participation of individual grower members from among ACGA's disparate constituency is required, particularly as it "is not clear whether the [association's] interests would be served or disserved by enhanced competition in the market" alleged by the Complaint. *Associated Gen. Contractors*, 459 U.S. at 539. If it remains unclear as to whose interests ACGA actually represents, this case will be riddled with individual inquiries that necessitate the participation of ACGA's members.

> **D.    The Filing of This Action Raises a Serious Question Arises About the Ability of Counsel to Pursue the Divergent Interests of ACGA and the Putative Class Members**

Permitting this case to proceed would threaten the integrity of both these proceedings and *Pullen* and *Wade*. By representing both ACGA (which claims to

represent the interests of members apparently including organic growers, as described above) and the putative class (comprised solely of non-organic growers), counsel is attempting to represent parties with conflicting interests, as described above. The members of AGCA who are non-organic growers are thus represented already in the putative class, and counsel is disabled from claiming that the representation is inadequate. Thus, the only new interests AGCA brings into this dispute are those of organic farmers, as to whom there is a conflict. This conflict, in turn, draws into question the ability of the putative class counsel to satisfy the requirements of Rule 23(a)(4), which demands that "the representative parties will fairly and adequately protect the interests of the class." *Georgine v. Amchem Prods.*, 83 F.3d 610, 630 (3d Cir. 1996) (holding that a Rule 23(a)(4) inquiry requires the Court to evaluate whether class counsel is qualified and serves the interests of the entire class); *see also Davis v. Kraft Foods N. Am.*, No. 03-6060, 2006 U.S. Dist. LEXIS 3512 (E.D. Pa. Feb. 1, 2006) (holding that counsel could not represent both class and an individual with conflicting interests, even in the context of a waiver by the parties). Counsel cannot be permitted to server two masters with divergent interests.

## E.     If Any Question Remains as to ACGA's Lack Of Standing, the Court Should Permit Monsanto to Take Limited Jurisdictional Discovery

Plaintiff's Complaint thus fails to establish standing to sue. If the Court needs to go beyond the forum motion and has any doubts as to ACGA's lack of standing based upon the available facts, Monsanto respectfully requests leave to take limited jurisdictional discovery. While the decision to permit jurisdictional discovery when presented with a Rule 12(b)(1) motion lies within the discretion of the Court, "[the] rule is generally that jurisdictional discovery should be allowed . . . ." *Mass. Sch. of Law at*

25

*Andover v. Am. Bar Assn.*, 107 F.3d 1026, 1042 (3d Cir. 1997). The types of

jurisdictional discovery that the Third Circuit has allowed pursuant to Rule 12(b)(1)

include document requests, interrogatories, and depositions.[16]

Monsanto requests jurisdictional discovery to pursue the following relevant lines

of inquiry: (1) ACGA's membership; (2) ACGA's organizational purpose; (3) whether

that purpose is germane to the interests that ACGA is trying to protect by filing this

lawsuit; (4) whether ACGA represents all of its constituents, or merely a subset; (5)

whether ACGA growers are already represented by the putative Federal Injunction Class

in *Pullen* and *Wade*; (6) whether any of ACGA's members purchase or advocate the use

or non-use of non-organic herbicides (or any other products) or genetically modified seed

products; (7) whether any third parties were involved in authorizing, filing, or funding the

lawsuit; (8) what interests ACGA are protecting that are not already served by the actions

in *Pullen* and *Wade*; and (9) the nature and extent of the conflict between or among the

various members of the association and the purported class members.[17] Each of these

---

[16]  *See also Doe v. Goldstein's Deli*, 82 Fed. App'x. 773, 774 (3d Cir. 2003) (allowing
both parties to conduct discovery on the issue of jurisdiction, and then held an evidentiary
hearing involving fourteen witnesses conducted over the course of four days); *Kehr
Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1408 (3d Cir. 1991) (the district court also
permitted defendants to conduct discovery to determine whether subject matter
jurisdiction existed); *Swiger v. Allegheny Energy Supply Co., LLC*, No. 05-cv-5725, 2006
U.S. Dist. LEXIS 32059 at *14 (E.D. Pa. May 22, 2006) (staying all proceedings for sixty
days "to permit the parties to engage in discovery (i.e., exchange of interrogatories,
documents requests, taking of depositions, etc.)," in each of the jurisdictional issues
raised by the defendants' motion); *Adkins*, 450 F. Supp. 2d at 447 (permitting the parties
to conduct jurisdictional discovery on the issues relevant to standing, allowing each party
to both take depositions and serve interrogatories).

[17] As the Technology Agreement designates St. Louis as the exclusive forum for
litigation of Plaintiff's claims, any discovery should be conducted under the auspices of
the court there.

lines of inquiry is both relevant and necessary to resolve any question that may remain as to ACGA's lack of standing to pursue the claims brought here.

**CONCLUSION**

ACGA's claims fall within the scope of the forum selection clause in the Technology Agreement, and this suit should have been filed in St. Louis.  The Agreement is enforceable regardless of whether the signatories bring the claims in their own names, as in *Pullen* and *Wade*, or through a surrogate, as here.  The Court should dismiss this case for failure to state a claim upon which relief can be granted.  If the Court reaches the jurisdictional issue, it should dismiss this case for lack of subject matter jurisdiction because ACGA lacks standing to sue on its own behalf or on behalf of its members.

Respectfully submitted,

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Peter E. Moll
John J. Rosenthal
Scott Flick
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC  20004
Tel:  (202) 783-0800
Fax: (202) 383-6610

Kenneth A. Letzler
Jonathan I. Gleklen
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Tel:  (202) 942-5000
Fax: (202) 942-5454

By:   */s/ David E. Moore*
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Hercules Plaza, 6th Floor
        1313 N. Market St.
        Wilmington, DE 19801
        Tel:  (302) 984-6000
        Fax: (302) 658-1192
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

*Attorneys for Defendant Monsanto Company*

Dated: March 13, 2007
783320 / 31255

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 13, 2007, the attached document

was hand delivered to the following persons and was electronically filed with the Clerk of

the Court using CM/ECF which will send notification to the registered attorney(s) of

record that the document has been filed and is available for viewing and downloading:

Jeffrey S. Goddess
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
jgoddess@rmgglaw.com

I hereby certify that on March 13, 2007, I have Electronically Mailed the

documents to the following:

Bruce E. Gerstein
Noah H. Silverman
Joseph Opper
Garwin Gerstein & Fisher, LLP
1501 Broadway, Suite 1416
New York, NY 10036
bgerstein@garwingerstein.com
nsilverman@garwingerstein.com
jopper@garwingerstein.com

Adam M. Moskowitz
T. Tucker Ronzetti
David M. Buckner
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
amm@kttlaw.com
tr@kttlaw.com
dmb@kttlaw.com

Stuart E. Des Roches
Odom & Des Roches, LLP
650 Poydras Street
Suite 2020
New Orleans, LA 70130
stuart@odrlaw.com

Daniel Berger
Eric Cramer
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
danberger@bm.net
ecramer@bm.net

Michael Miller
Law Office of Michael Miller
926 Chulie Drive
San Antonio, TX 78216
mdm@mdmlaw.net

Lance A. Harke
Harke & Clasby, LLP
155 S. Miami Avenue, Suite 600
Miami, FL 33130
lharke@harkeclasby.com

I hereby certify that on March 13, 2007, I have sent the documents via U.S. Mail

to the following:

David P. Smith
W. Ross Foote
Percy, Smith & Foote, LLP
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309

Roger C. Bolin
Boyle & Bolin Attorneys at Law
227 E. Court St.
Hennepin, IL 61327

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

783308 / 31255